Argued and submitted March 7, peremptory writ to issue July 31, 1997

STATE ex rel OREGON HEALTH
SCIENCES UNIVERSITY,
*Plaintiff-Relator,*

*v.*

Harl H. HAAS,
Circuit Court Judge, Multnomah County,
*Defendant.*

(SC S42952)*

942 P2d 261

---

* Relating to Multnomah County Circuit Court No. 9404-02433.

Robert B. Rocklin, Assistant Attorney General, Salem, argued the cause for relator. With him on the briefs were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Thomas C. Phelan, Vancouver, Washington, and Stephen G. Leatham, of Heurlin & Potter, P.S., Vancouver, Washington, argued the cause and filed the brief for defendant.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.**

GRABER, J.

---

** Kulongoski, J., did not participate in the consideration or decision of this case.

## GRABER, J.

In this original mandamus proceeding, relator seeks a peremptory writ of mandamus that would protect from discovery an investigatory report prepared by its lawyer. Relator is Oregon Health Sciences University (OHSU), and defendant is a Multnomah County Circuit Court judge before whom a case involving relator is pending. At issue is whether a statement about the lawyer's report, made by the chair of OHSU's Anesthesiology Department during a faculty meeting, waived the lawyer-client privilege. For the reasons that follow, we hold that no waiver occurred. Because the report is protected by the lawyer-client privilege, we direct the issuance of a peremptory writ of mandamus requiring defendant judge to vacate his order that OHSU produce the report.

The plaintiff in the underlying action, Dr. Geary, is a licensed medical doctor who was enrolled in OHSU's residency program in anesthesiology. She alleges that OHSU and Dr. Kingston, the chair of the Anesthesiology Department, discriminated against her on the basis of her sex.

At Kingston's request, a lawyer for OHSU named Billups conducted an internal investigation to determine whether discrimination existed in the Anesthesiology Department. Billups prepared a confidential, five-page report (Billups report). In conducting the investigation that led to the preparation of her report, Billups spoke with numerous employees of OHSU and assured them of confidentiality. Billups gave copies of the report only to Kingston and to the dean of OHSU's medical school.

During discovery, Geary demanded a copy of the Billups report. OHSU refused to provide it on the ground that the report was protected by the lawyer-client privilege. Geary filed a motion to compel production of the report, asserting that Kingston had waived the privilege when he discussed the report at a faculty meeting of the Anesthesiology Department. After a hearing, the trial court (not defendant judge) denied the motion.

Geary also issued a subpoena to an OHSU employee, ordering him to produce a copy of the Billups report. OHSU

moved to quash the subpoena, and the trial court (not defendant judge) granted the motion, without stating the grounds for the order.

During trial, the issue arose for a third time. Defendant judge was the trial judge. At trial, the perpetuation deposition of Dr. Ku, a former assistant professor in the Anesthesiology Department, was read into evidence. Ku testified as follows about comments that Kingston had made about the report at the Anesthesiology Department's faculty meeting, at which only members of the OHSU faculty were present.

"BY [GEARY'S LAWYER]:

"* * * * *

"Q. Did Dr. Kingston show you that report?

"A. Yes, he did show us the thick report,[1] but he didn't show us the contents.

"Q. Did he discuss with you any of the findings of the report?

"A. He said the findings were that our department has a problem with sexual discrimination or racial discrimination or all that. It was very long, you know. That he said that we do have a problem, the legal department has concluded that we do have a problem. And there are a couple—advice that came out of it, came out from the legal department, was that if we do get sued —

"[OHSU's LAWYER]: Again, I am going to object as to advice from the legal department. That's attorney/client privilege.

"A. The legal department —

"Q. I'm sorry, counsel has declared or asked that it's a privileged communication. What I want to find out is, as a result of what you just testified to—these are all legal rules, Doctor.

"I hate to interrupt you, but after Dr. Kingston talked about the sex and race discrimination, did he have a program? Was something put into place?

---

[1] Although Ku referred to the Billups report as being "thick," it is only five pages long.

"A. Yes. I mean, he said that there's a couple, three things that we need to do.

"First thing is, all the faculty need to know that OHSU will not cover the legal bill in case we get sued.

"The second thing was that we had to attend a sensitivity videotape training, that we have to watch the videotape to know the definition of the problem.

"Q. And do you recall what the third thing was?

"A. No, I don't. I mean, it was something kind of really vague, so I don't remember that."

During the reading of Ku's deposition at trial, defendant judge ruled that Kingston's statement at the faculty meeting had waived the lawyer-client privilege that had protected the confidentiality of the report. Defendant judge ordered production of the Billups report.[2]

Shortly thereafter, at the parties' request, defendant judge declared a mistrial. He then held an evidentiary hearing to determine whether OHSU had waived the lawyer-client privilege as to the Billups report. At the hearing, Kingston testified that he had announced at a faculty meeting and at an executive committee meeting that a report had been prepared and that, based on the report, he believed that training on sexual harassment and gender discrimination issues was in order. He also denied telling anyone the contents of the report.

After the hearing, defendant judge issued a written order requiring production of the Billups report under a protective order.[3]

---

[2] In his oral ruling, defendant judge stated:

"Well, okay, on the two principal issues, the first issue it's the court's finding that the person who had this privilege[,] the head of the department[,] made significant disclosures of it and of its finding at the meeting involved, and that Dr. Ku was not a representative employee or client if you will, and that the court is going to order production of that report to the plaintiff. That's not saying what comes in or what doesn't come in or anything else, it's just they're entitled to see the report. Doctor [Kingston] can't get up and talk about findings and everything and then hide behind the privilege."

[3] In the written order, defendant judge wrote that "[t]he Billups Report is discoverable under a protective order" but did not explain either the basis for his ruling or the nature of the protective order.

OHSU petitioned for an alternative writ of mandamus, and this court issued an alternative writ. For the reasons that follow, we now direct the issuance of a peremptory writ.

■ Defendant judge argues, as a preliminary matter, that mandamus is not an appropriate remedy, because OHSU can appeal defendant judge's discovery ruling and thereby has a plain, speedy, and adequate remedy at law. *See State ex rel LeVasseur v. Merten*, 297 Or 577, 579-80, 686 P2d 366 (1984) (ordinarily mandamus will not lie if there is a plain, speedy, and adequate remedy in the course of the law). We disagree. Once a privileged communication has been disclosed, the harm cannot be undone. Mandamus is an appropriate remedy when a discovery order erroneously requires disclosure of a privileged communication. In *State ex rel Automotive Emporium v. Murchison*, 289 Or 265, 268-69, 611 P2d 1169, *reh'g den* 289 Or 673, 616 P2d 496 (1980), this court explained that mandamus is appropriate in such cases, because relators otherwise would "suffer[ ] an irretrievable loss of information and tactical advantage which could not be restored to them on direct appeal." We exercise our discretion to proceed in mandamus.

■ The parties do not dispute that the Billups report was confidential and protected by the lawyer-client privilege when Billups provided copies of it to the dean of the medical school and to Kingston as chair of the Anesthesiology Department. Rather, the issue before us is whether Kingston's comments at the faculty meeting waived the lawyer-client privilege as to that report.

■ Whether Kingston waived the lawyer-client privilege, an inquiry under Rule 511 of the Oregon Evidence Code (OEC), was a preliminary question of fact to be determined by the trial court under OEC 104(1).[4] *See Goldsborough v. Eagle Crest Partners, Ltd.*, 314 Or 336, 342, 838 P2d 1069 (1992) (whether waiver of the lawyer-client privilege

---

[4] OEC 104(1) provides, in part:

"Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court * * *. In making its determination the court is not bound by the rules of evidence except those with respect to privileges."

occurred is a preliminary question of fact for the trial court under OEC 104). In this case, defendant judge did not make findings of fact but drew conclusions of law. In deciding preliminary questions of fact, the court is to use a preponderance-of-the-evidence standard. *Ibid.* On review for errors of law, this court views the record in a manner consistent with the trial court's ruling under OEC 104(1) and assumes that the trial court found facts consistent with its final conclusion. *Id.* at 342 & n 9. Because the trial court ordered disclosure of the report, we look at the record in the light most favorable to the order of disclosure. *See State ex rel Ware v. Hieber*, 267 Or 124, 127-28, 515 P2d 721 (1973) (in a mandamus proceeding, when the facts are in dispute, this court accepts reasonable factual inferences that the trial court could have made). In practical terms, that means that we will use Ku's version of events, rather than that of Kingston and others who testified differently than Ku.

OEC 511 explains when the lawyer-client privilege is waived. It provides, in part:

> "A person upon whom [OEC 503 to 514] confer a privilege against disclosure of the confidential matter or communication waives the privilege if the person or the person's predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication. This section does not apply if the disclosure is itself a privileged communication. Voluntary disclosure does not occur with the mere commencement of litigation or, in the case of a deposition taken for the purpose of perpetuating testimony, until the offering of the deposition as evidence."

Under that rule, when a holder of the lawyer-client privilege voluntarily has disclosed material covered by the privilege, two considerations arise in determining whether a waiver has occurred: (1) whether the disclosure was "itself a privileged communication" and, if not, (2) whether the disclosure was of a "significant part of the matter or communication."

Beginning with the first consideration, we must determine whether Kingston's statement about the Billups report during the faculty meeting was "itself a privileged

communication." OEC 511. Here, OHSU argues specifically that Kingston's statement was itself covered by the lawyer-client privilege.[5]

To decide that issue, we turn to OEC 503, which defines the lawyer-client privilege. That rule provides, in part:

"(1) As used in this section, unless the context requires otherwise:

"(a) 'Client' means a person, public officer, corporation, association or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from the lawyer.

"(b) 'Confidential communication' means a communication not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.

"* * * * *

"(d) 'Representative of the client' means a principal, an employee, an officer or a director of the client:

"* * * * *

"(B) Who, as part of such person's relationship with the client as principal, employee, officer or director, seeks, receives or applies legal advice from the client's lawyer.

"* * * * *

"(2) A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

"* * * * *

"(d) Between representatives of the client or between the client and a representative of the client[.]

---

[5] The second sentence of OEC 511 is not limited to disclosures that are protected by the same privilege as the original communication; it refers to any disclosure that "is itself a privileged communication" of any kind.

"\* \* \* \* \*

"(3) The privilege created by this section may be claimed by the client, a guardian or conservator of the client, the personal representative of a deceased client, or the successor, trustee, or similar representative of a corporation, association, or other organization, whether or not in existence. The person who was the lawyer or the lawyer's representative at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the client."

The purpose of the lawyer-client privilege, in general,

"is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn Co. v. United States*, 449 US 383, 389, 101 S Ct 677, 66 L Ed 2d 584 (1981).

*See also State v. Jancsek*, 302 Or 270, 274, 730 P2d 14 (1986) (discussing purpose of lawyer-client privilege).[6]

At the outset, we note (and the parties agree) that OHSU is the client. An "entity" like OHSU can be a client under the definition of "client" in OEC 503(1)(a). Additionally, OHSU, through Kingston, consulted with Billups to obtain professional legal services. Billups rendered professional legal services to OHSU; those services took the form of an investigation, including interviews with OHSU employees, and the preparation of the Billups report. Thus, OHSU was "rendered professional legal services by a lawyer," making it a "client" within the meaning of OEC 503(1)(a).

---

[6] In discussing the purpose of the lawyer-client privilege, one commentator states that the privilege

"rest[s] on the utilitarian theory that encouraging clients to make the fullest disclosure to their attorneys enables attorneys to act more effectively, justly, and expeditiously, and that these benefits outweigh the risks posed by barring full revelation in court. The privilege also bears on the right to effective assistance of counsel. While the benefits of the privilege are commonly understood to focus on the client, it has also been noted that there are advantages to the justice system from fully informed counsel." 3 *Weinstein's Federal Evidence* § 503.03[1] (Matthew Bender 2d ed 1997) (footnotes omitted).

■ ■ We next consider whether Kingston's statement at the Anesthesiology Department's faculty meeting was itself a communication protected by the lawyer-client privilege, a task that requires us to construe OEC 503(2). In construing a statute, the court attempts to discern the legislature's intent. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). We begin by analyzing the text and context of OEC 503(2). *See ibid.* (examination of text and context of statute occurs at first level of analysis). Words of common usage typically should be given their plain, natural, and ordinary meaning. *Id.* at 611.

This court has held that application of the lawyer-client privilege in OEC 503(2) hinges on three findings. *Jancsek*, 302 Or at 275. First, the communication must be "confidential" within the meaning of OEC 503(1)(b). Second, the communication must be made for the purpose of facilitating the rendition of professional legal services to the client. Third, the communication must have been between persons described in one of the paragraphs of OEC 503(2)(a) through (e). *Ibid.*

As noted, the first requirement is that the communication be confidential within the meaning of OEC 503(1)(b). The communication ultimately at issue in this case is the Billups report. The parties agree that the report was confidential when it was prepared and provided to Kingston and to the dean of the medical school.

■ In this section of the opinion, however, we are considering more specifically whether Kingston's statement at the faculty meeting was itself privileged. Thus, we must consider whether his statement, too, was confidential. Ku testified that Kingston was advising the faculty, based in turn on the lawyer's advice, about how faculty members should behave in order to avoid subjecting OHSU to liability. Only members of the faculty were present. On this record, Kingston's communication to the faculty was not intended to be disclosed to third persons.

■ The second requirement of OEC 503(2) is that the communication be made for the purpose of facilitating the rendition of professional legal services to the client. The Billups report itself meets the second criterion: A lawyer who

conducts an internal investigation concerning a client's potential legal liability, provides the client with a written report on the results of that investigation, and advises the client on ways to resolve problems uncovered in the investigation renders professional legal services to the client.

We also must decide whether Kingston's statement at the faculty meeting was "made for the purpose of facilitating" that rendition of legal services to OHSU. OEC 503(2). To "facilitate" means, as relevant, "to make easier or less difficult" or "to lessen the labor of (as a person): ASSIST, AID." *Webster's Third New Int'l Dictionary* 812 (unabridged ed 1993). According to Ku's testimony, Kingston passed along advice from OHSU's lawyer to members of the faculty. Also according to Ku's testimony, Kingston did so in order to inform the faculty of what they were to do in the future that would reduce OHSU's exposure to liability and that was consistent with the legal advice that OHSU had received. For example, faculty members would attend "sensitivity" training. For an entity like OHSU to make use of legal advice, the entity must inform at least some individuals of the content of that advice in order to enlist their assistance and aid in carrying out the advice. On this record, Kingston's statement was made for the purpose of obtaining the assistance or aid of the faculty with respect to the professional legal services that OHSU had obtained. Accordingly, Kingston's statement meets the second criterion.

■ The third requirement is that the communication occur between the persons described in one of the paragraphs, (a) through (e), of OEC 503(2). Kingston's comments at the faculty meeting do not fall within paragraph (a), (b), (c), or (e), because each of those provisions requires the presence of a lawyer or a representative of a lawyer, and no such person was present at the faculty meeting. Therefore, the only potentially applicable provision is (d), which covers communications "[b]etween representatives of the client."

For this purpose, the parties agree that Kingston is a representative of the client. The question is whether the faculty members, too, were "representatives of the client" within the meaning of OEC 503(1)(d)(B). For purposes of analysis,

we divide the definition of "representative of the client" into four phrases:

> " 'Representative of the client' means [1] a principal, an employee, an officer or a director of the client:
>
> "* * * * *
>
> "* * * [2] Who, as part of such person's relationship with the client as principal, employee, officer or director, [3] seeks, receives or applies legal advice [4] from the client's lawyer."

We will begin by analyzing the text of each phrase, after which we will discuss the context of OEC 503(1)(d)(B).

The first phrase provides a list of the kinds of people who potentially can be representatives of the client. A principal, an officer, and a director typically hold high-ranking positions within an entity. By contrast, the list also includes the term "employee," without specifying any particular level or kind of employee.

The first phrase can be read in either of two ways. One way is to use the doctrine of *ejusdem generis*, which "limits general language to things of the same kind as those specifically enumerated." *Moore v. Schermerhorn*, 210 Or 23, 32-33, 307 P2d 483, 308 P2d 180 (1957). If the term "employee" were considered to be "general language" and if that doctrine were applied, then an employee would have to hold a high-ranking position to fit within the first phrase of the definition in OEC 503(1)(d)(B). On the other hand, the court cannot "insert what has been omitted" from a statute. *PGE*, 317 Or at 611; ORS 174.010. The term "employee" has no limiting adjective. On the face of the text of OEC 503(1)(d)(B), any employee potentially can be a "representative of a client." Although the latter reading is more consonant with the wording of the text, both are plausible. That being so, the text of the first phrase is ambiguous.

The second phrase of OEC 503(1)(d)(B) qualifies the list of persons described in the first phrase. The definition covers only an employee who acts "as part of such person's relationship with the client as * * * employee."[7] That text is

---

[7] Because the faculty members are employees of OHSU but are not principals, officers, or directors, the remainder of this opinion will refer only to "employees."

unclear about whether an employee who seeks, receives, or applies legal advice[8] must do so as a *routine or expected* part of his or her job, such as would be true of many personnel managers, or whether *any* work-related contact with the client's lawyer suffices as long as the other statutory requirements are met. Thus, the second phrase remains ambiguous after an analysis of its text.

The third phrase requires that the person who meets the requirements of the first two phrases "seek[ ], receive[ ] or appl[y] legal advice." Those verbs are joined by the term "or," indicating that the person need do only one of those three things, not all three, to be covered by the definition. The usual meaning of "seek" is, as relevant, "to inquire for: ask for: * * * REQUEST." *Webster's* at 2055. "Receive" is defined in part as "to give attention to: listen to." *Id.* at 1894. "Apply" means "to put to use esp. for some practical purpose" or "to put into effect: IMPOSE." *Id.* at 105.

Although OEC 503(2) uses the term "legal services," the third phrase in OEC 503(1)(d)(B) instead uses the term "legal advice." "Advice" means, as relevant, a "recommendation regarding a decision or course of conduct: COUNSEL." *Id.* at 32. Legal services is a broader term than legal advice. *See State v. Ogle*, 297 Or 84, 102-03, 682 P2d 267 (1984) (Lent, J., dissenting) (noting that "the rendition of legal advice is only a part of rendition of legal services").

Although *applying* the phrase "seeks, receives or applies legal advice" to the facts of a particular case may be difficult, *the phrase itself* is not ambiguous. The text of the third phrase in OEC 503(1)(d)(B) is clear.

The final phrase in OEC 503(1)(d)(B) is "from the client's lawyer," and it modifies the term "legal advice." "From" is a function word that can indicate "a starting point" or "the source or original or moving force of something." *Webster's* at 913. Read in the context of OEC 503 as a whole, that phrase means that the legal advice must originate with the lawyer, but the lawyer need not be the one who relays that advice directly.

---

[8] The phrase "seeks, receives or applies legal advice" is the third phrase of OEC 503(1)(d)(B) and is discussed below. 325 Or at 504.

Under OEC 503(2)(d), a client has a privilege to refuse to disclose a confidential communication between the representatives of the client or between the client and a representative of the client, if the communication was made for the purpose of facilitating the rendition of professional legal services to the client. By definition, such a communication is not made directly by the lawyer to the client. Logically, then, the privilege is not limited to communications made directly from the lawyer to the client. Additionally, OEC 503(1)(b) defines "confidential communication" without requiring that the communication be made directly by the lawyer. Reading OEC 503 as a whole, there is no requirement that *each* employee seek, receive, or apply legal advice *directly* from the client's lawyer to be a representative of the client. At the first level of analysis, we conclude that, under the fourth phrase of OEC 503(1)(d)(B), the legal advice must originate with the lawyer but may be communicated by other individuals who are themselves covered by the privilege.

With respect to the first three phrases of OEC 503(1)(d)(B), no other provisions in OEC 503, or in the rules of evidence generally, provide guidance. However, prior versions of a statute also are considered part of context. *State ex rel Penn v. Norblad*, 323 Or 464, 467, 918 P2d 426 (1996). The Oregon Legislature adopted the current definition of "representative of the client" in 1987. Before that, OEC 503(1), originally adopted as part of the Oregon Evidence Code in 1981, contained this definition:

> " 'Representative of the client' means a person who has authority to obtain professional legal services and to act on advice rendered pursuant thereto, on behalf of the client." OEC 503(1)(d) (1981).[9]

---

[9] The predecessor of OEC 503(2) was *former* ORS 44.040, *repealed by* Or Laws 1981, ch 892, § 98, which protected confidential communications within particular relationships, including the relationship between a lawyer and a client, and which provided, in part:

"(1) There are particular relations in which it is the policy of the law to encourage confidence, and to preserve it inviolate; therefore a person cannot be examined as a witness in the following cases:

"* * * * *

"(b) An attorney shall not, without the consent of the client, be examined as to any communication made by the client to the attorney, or the advice given

By defining "representative of the client" in that way, the legislature in 1981 adopted the "control group" test, under which only those persons with authority to seek out and act on legal advice for the client could be representatives of the client. *See Jancsek*, 302 Or at 276-81 (explaining history of definition of "representative of the client" adopted in 1981 and its incorporation of control group test). *See also* Laird C. Kirkpatrick, *Oregon Evidence* 218 (3d ed 1996) (legislature adopted control group test in original OEC 503(1), enacted in 1981).

The adoption of a new and textually broader definition of "representative of the client" in 1987 suggests that the legislature wanted to move away from the control group test. However, context does not resolve the two specific ambiguities, identified above, in the definition of "representative of the client."

Because the legislature's intent is not clear from an analysis of the text and context of OEC 503(1)(d)(B), we proceed to the second level of analysis and consider the legislative history of the statute. *See PGE*, 317 Or at 611-12 (if legislature's intent is not clear from text and context inquiry, the court considers legislative history).

As noted, the definition of "representative of the client" in the 1981 Oregon Evidence Code differs from the definition now found in the OEC. The 1981 version of OEC 503 was based on *proposed* Federal Rule of Evidence (FRE) 503, which had been promulgated by the United States Supreme Court but not enacted by Congress. OEC 503 Commentary (1981).[10] Early drafts of the proposed federal rules contained

---

by the attorney thereon, in the course of professional employment." *Former* ORS 44.040 (1979).

That former statute did not use the term "representative of the client" at all and provides no guidance in interpreting OEC 503.

[10] The Legislative Commentary on the Oregon Evidence Code is not an official part of the Code and is not controlling. However, it provides guidance in interpreting the rules of evidence. *State v. McClure*, 298 Or 336, 344, 692 P2d 579 (1984).

This court concluded in *State v. Chakerian*, 325 Or 370, 378-79, 938 P2d 756 (1997), that the Criminal Law Revision Commission's commentary on the Oregon Criminal Code of 1971 should be considered at the second level of analysis, as part of that Code's legislative history, rather than at the first level of analysis. Similarly, we conclude that the Legislative Commentary on the Oregon Evidence Code should be considered as part of that Code's legislative history.

a definition of "representative of the client" that was nearly identical to the one found in the 1981 version of the OEC. *See* 3 *Weinstein's Federal Evidence* § 503App.01[3][a] (Matthew Bender 2d ed 1997) (quoting federal definition). However, the Advisory Committee deleted that definition and did not define the term at all in its final draft. The Advisory Committee's Notes on the final draft explain that, in the Committee's opinion, "the matter is better left to resolution by decision on a case-by-case basis." *Id.* at § 503App.01[2].[11]

Congress did not adopt proposed FRE 503. Instead, it adopted a general rule on privileges that incorporated "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." FRE 501.

The definition of "representative of the client" that Oregon adopted in 1987 was not patterned after a definition in the proposed or enacted Federal Rules of Evidence. Thus, there is no federal commentary to guide us.

Similarly, OEC 503(1)(d) is not patterned after any other state's definition of "representative of the client." Therefore, no other state's interpretation of that term is instructive.

There is, however, some Oregon legislative history that is of assistance. In 1981, the United States Supreme Court rejected the "control group" test and broadened the scope of the lawyer-corporate client privilege in federal proceedings. *Upjohn*, 449 US at 389-97. In response to that case and to the developing trend toward recognizing a broader lawyer-client privilege in the corporate setting, the 1987

---

[11] *Weinstein's* explains why the Advisory Committee decided not to define the term "representative of the client":

"Strong opposition continued to be expressed to defining a 'representative of the client' in terms of the control group. A more liberal rule had been adopted by *Harper & Row Publishers, Inc. v. Decker*[, 423 F2d 487 (7th Cir 1970), *aff'd by an equally divided court*, 400 US 348, 91 S Ct 479, 27 L Ed 2d 433 (1971)]. Since the Supreme Court was split 4-4 on the issue (Justice Douglas abstaining), it was apparent that the Advisory Committee could not draft a rule satisfactory to a majority of the Supreme Court. No decision had been written in that Court and there was no basis for a compromise draft. The definition was therefore eliminated leaving the matter for case-by-case resolution." 3 *Weinstein's* at § 503App.01[3][c] (footnotes omitted).

Oregon Legislature adopted a much broader definition of "representative of the client" than had existed before. Kirkpatrick at 218. Senator Frye, chair of the Senate Judiciary Committee, expressed the legislature's intent to expand the privilege in the corporate context when he carried the 1987 bill on the Senate floor:

> "Under the present state of the law, only those officers of a corporation who are in what we call a control group can make a communication with the corporation's attorney and expect it to be free from discovery or disclosure. However, as a practical matter, there are many other individuals outside of this control group * * * that need to communicate on behalf of the client with the attorney for the purpose of receiving legal advice. And this bill then changes the attorney-client privilege by expanding it to include individuals who are representing the client and who are seeking the advice or giving the information [or] making the communication for the purpose of receiving legal advice. And whether that person is an employee or an officer or someone else that's described in here, * * * who communicates with the attorney for the purpose of seeking legal advice, those communications will be protected." Tape Recording, Senate Floor Debate, May 28, 1987, Tape 145, Side A.

Much of the legislative history of the 1987 amendment redefining "representative of the client" consists of testimony by two witnesses during a public hearing before the Senate Judiciary Committee. Both witnesses spoke in favor of adoption of the proposed amendment. Tape Recording, Senate Judiciary Committee, May 5, 1987, Tape 128, Side A, & Tape 129, Side A. Although a witness's testimony "say[s] little about the intent of the Oregon Legislative Assembly as a whole," *State v. Guzek*, 322 Or 245, 260, 906 P2d 272 (1995), such testimony, when consistent with the enacting legislators' own acts and comments, can provide some insight into legislative intent.

During his testimony, Edward Lewis, associate general counsel at Tektronix, Inc., illustrated the effect that the bill would have by giving a series of examples and responding to examples posed by members of the committee. One example is particularly revealing. It involved an assembly line

worker who reported to management that defective equipment intentionally was being used in the manufacture of a product. In the example, the company's lawyer became involved in an investigation and talked to the employee who had made the report. Senator Frye stated, and Lewis agreed, that the conversation with the lawyer would be privileged under the proposed bill. Lewis further explained that the underlying fact that the employee saw the problem is not privileged. The following exchange then took place:

> Senator Frye: "Whenever an employee, no matter how low in ranking, makes a communication to the person who's acting as * * * in-house counsel about a factual situation, * * * that communication would be precluded from discovery, whenever that situation might arise, even if it's not very often? * * * The mere fact that an employee makes a communication to the person acting as corporate counsel * * * that act then takes that communication out of the realm of discovery?"

> Lewis: "I'm not sure I'd concede that it's quite that broad, because the communication has to be in connection with the attorney's providing legal advice and services to the company. It just can't be any sort of communication. It has to * * * involve the attorney's activities in fact-gathering and trying to advise the company on a particular legal matter." Tape Recording, Senate Judiciary Committee, May 5, 1987, Tape 128, Side A.

That example helps to resolve the two remaining ambiguities in OEC 503(1)(d)(B). The example shows, first, that the employee need not be high-ranking to be a representative of the client. Second, the example shows that the employee's interaction with the lawyer does not have to be a regular part of his or her job; an assembly line worker typically does not have regular contact with a lawyer as part of the job. Thus, the hypothetical helps to resolve the ambiguities in the first and second phrases of the definition of "representative of the client." After considering text and context and legislative history, we conclude (1) that any employee of a client may be a representative of the client and (2) that interaction with the client's lawyer need not be a regular part of the employee's job for the employee to qualify as a representative of the client.

We turn now to the facts of the present case. Kingston and the individuals present at the faculty meeting were employees of OHSU. The communication was work-related, and it is irrelevant whether contact with OHSU's counsel was a routine part of their jobs. Accordingly, the first two requirements of OEC 503(1)(d)(B) are satisfied.

Kingston sought legal advice from Billups when he asked her to investigate whether the Anesthesiology Department had a problem with sexual harassment. In response, he received the Billups report. The report contained Billups' "recommendation regarding a decision or course of conduct" and, therefore, constituted legal advice. The parties do not dispute that Kingston could seek and receive legal advice.

However, as noted, they do dispute whether Kingston's statement to the faculty was itself privileged. His comments potentially involve both the receipt and the application of legal advice. The faculty members received legal advice, because they gave attention to Billups' legal advice, as relayed by Kingston. Additionally, Kingston applied the advice, because he put it into effect or put it to use especially for a practical purpose by telling the faculty that the Department had a problem with discrimination, that OHSU would not indemnify the staff in the event of litigation, and that gender sensitivity training was necessary. Therefore, the third requirement in the definition of "representative of the client" is satisfied.

Billups presented her legal advice to OHSU in written form. Had she been present at the faculty meeting to discuss the findings and conclusions contained in her report, the report and the statements made at the meeting would have remained privileged. The fact that Kingston, rather than Billups herself, relayed the advice does not alter the result. Kingston was the conduit of Billups' legal advice at the faculty meeting. Thus, the fourth requirement of OEC 503(1)(d)(B) is met.

Based on the foregoing discussion, we conclude that all the individuals present at the faculty meeting were "representatives of the client" within the meaning of OEC 503(1)(d)(B). That being so, and the other criteria having

been met, Kingston's comments on the report were themselves privileged under OEC 503(2). We therefore hold that Kingston did not waive the lawyer-client privilege, under OEC 511, by commenting on the Billups report at the faculty meeting. Based on that holding, we need not and do not consider whether Kingston's disclosure was of a "significant part of the matter or communication" within the meaning of OEC 511.

■■ ■■ Defendant judge raises two additional, alternative arguments. First, he asserts that OHSU waived the lawyer-client privilege, because counsel's objection to Ku's testimony[12] during the perpetuation deposition was untimely and insufficient. An objection is "timely" if it is made as soon as its applicability to the offered evidence is known to the opponent of the evidence. *Blanton v. Union Pacific Railroad Co.*, 289 Or 617, 623, 616 P2d 477 (1980). In addition, an objection to offered evidence must state the specific ground of the objection. OEC 103(1)(a).

Geary's lawyer asked Ku simply whether Kingston had discussed the findings of the Billups report with the faculty. That question required only a "yes" or "no" answer; it did not call for revelation of the content of the report. OHSU's counsel had no need to object to the question. Ku's *answer*, however, went beyond what was asked and included arguably privileged material.

The determination whether counsel's objection to that answer was timely and sufficient is more complicated. OEC 511 contains a special rule that applies to perpetuation depositions. It provides in part that "[v]oluntary disclosure [resulting in waiver] does not occur * * * in the case of a deposition taken for the purpose of perpetuating testimony, until the offering of the deposition as evidence." Under OEC 511,

___

[12] Defendant judge refers to Ku's testimony, set out above, 325 Or at 495, which we repeat here for the sake of convenience:

"He said the findings were that our department has a problem with sexual discrimination or racial discrimination or all that. It was very long, you know. That he said that we do have a problem, the legal department has concluded that we do have a problem. And there are a couple—advice that came out of it, came out from the legal department, was that if we do get sued —"

"the effect of any waiver of privilege that occurs in such a deposition is delayed until the deposition is offered as evidence by a party at trial." OEC 511 Commentary (quoted in *State ex rel Grimm v. Ashmanskas*, 298 Or 206, 211, 690 P2d 1063 (1984)).

Ku's deposition was taken for the purpose of perpetuating testimony. A perpetuation deposition "is arranged by the litigants when it becomes known that a witness will be unavailable to testify at trial." *Grimm*, 298 Or at 211. In a perpetuation deposition,

> "[a]ll objections to any testimony or evidence taken at the deposition shall be made at the time and noted upon the record. The court before which the testimony is offered shall rule on any objections before the testimony is offered. Any objections not made at the deposition shall be deemed waived." ORCP 39 I(6).

Thus, to prevent a waiver of the lawyer-client privilege based on testimony given during a perpetuation deposition, a party must assert an objection twice. First, under ORCP 39 I(6), the party must object to disputed testimony during the taking of the perpetuation deposition. Second, assuming that the first objection was made, the party also must object to having the disputed testimony offered as evidence at trial.

Here, counsel objected during the perpetuation deposition, on the basis of the lawyer-client privilege, when Ku's answer went beyond what was asked. On the same basis, the lawyer again objected to having Ku's answer read into the record at trial.

Fairly understood in context, the objection made during the perpetuation deposition[13] encompassed Ku's entire answer, not just the sentence that she was uttering at the time of the objection. Counsel's objection began with the word "[a]gain." Two pages earlier in the transcript of the perpetuation deposition, OHSU's counsel had objected to a question that asked why Ku had talked to Billups:

---

[13] For the sake of convenience, we repeat counsel's objection here:

"Again, I am going to object as to advice from the legal department. That's attorney/client privilege."

"I am going to object here, because I believe you're getting into privileged information. And the privilege is obtained even to prior employees. That's covered in the disciplinary rule. I think that's the law of Oregon concerning attorney/client privilege here."

In a colloquy that followed, Geary's lawyer made clear that he was not seeking to ask about "the substance of the communication" and was trying not to ask about privileged matters. He next asked Ku: "I don't want you to relate what you may have told or discussed with Ms. Billups [about her investigation of the Anesthesiology Department]. What I would like to ask you now is: Was there a period of time after that that Dr. Kingston had a staff meeting?" She replied that there was. Then the questions and answers quoted above, 325 Or at 495, occurred. In the context of the prior, more extensive objection and of opposing counsel's acknowledgment that he was not seeking the substance of any privileged communication, the objection at issue was understood by the parties and by defendant judge to encompass Ku's entire answer.

The objection that OHSU's counsel made to the trial court, before it ruled on the admissibility of Ku's perpetuation deposition, was similarly broad. Counsel stated that he continued to object to Ku's testimony about both the "findings" of the Billups report and the "advice" received from the legal department.

In summary, counsel's objection during the taking of the deposition was timely, because it was made when Ku's answer to an unobjectionable question included privileged material. The second objection also was timely, because it was made before the disputed testimony in the perpetuation deposition was read into evidence. Furthermore, both objections were sufficient, because they gave the lawyer-client privilege as the specific ground for the objection. Therefore, OHSU did not waive the privilege by an untimely or insufficient objection.

Defendant judge's second alternative argument is that OHSU waived the privilege, because counsel failed to move to strike Ku's testimony about the Billups report during the perpetuation deposition. The argument, in essence, is

that "objection" was the wrong terminology. Ordinarily, if a "question [is] proper, but the witness, in answering it, testifie[s] to incompetent matters, * * * then the attorney * * * should [move] to strike the offending answer." *Noteboom v. Savin*, 213 Or 583, 589-90, 322 P2d 916, 326 P2d 772 (1958). An earlier objection to the unobjectionable question does not extend to the answer. *State v. Keller*, 315 Or 273, 284, 844 P2d 195 (1993).

That argument is not on point. Unlike in *Keller* and other cases relating to motions to strike testimony at trial, the dispute here is not whether an issue is preserved for appellate review but, rather, whether counsel waived a privilege at the time the witness was answering a question during a perpetuation deposition. Here, because counsel raised the issue of privilege as soon as Ku began testifying about the content of the Billups report, the privilege was not waived, irrespective of the terminology used. Defendant judge's alternative arguments are not well taken.

Peremptory writ to issue.