Argued and submitted July 23, reversed and remanded in part; otherwise affirmed
September 10, 1997

## STATE OF OREGON,
*Appellant,*

*v.*

## ROY HUBERT STONAKER, JR.,
*Respondent.*

## (D9507598M; CA A93687)

945 P2d 573

Jonathan H. Fussner, Assistant Attorney General, argued the cause for appellant. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Daniel Q. O'Dell, Deputy Public Defender, argued the cause for respondent. With him on the brief was Sally L. Avera, Public Defender.

Before De Muniz, Presiding Judge, and Haselton, Judge, and Richardson, Senior Judge.

HASELTON, J.

### HASELTON, J.

The state appeals from a pretrial order suppressing evidence of statements the complainant made to a 9-1-1 operator and to a police officer. *See* ORS 138.060(3). The trial court concluded that those statements did not fall within the "excited utterance" exception to the hearsay rule. OEC 803(2). We conclude that the 9-1-1 call statements did satisfy the requirements of OEC 803(2) but that the complainant's subsequent statements to the investigating officer did not. Accordingly, we reverse in part and affirm in part.

Defendant is charged with assault in the fourth degree, ORS 163.160, harassment, ORS 166.065, and menacing, ORS 163.190, all arising out of a domestic dispute that occurred late in the evening of December 16, 1995. The state moved *in limine*, for an order admitting a tape recording of a 9-1-1 call that the complainant made on that evening, as well as statements that the complainant made to the investigating police officer thereafter. For present purposes, the following facts adduced at the evidentiary hearing on the state's motion[1] appear to be undisputed: On the evening of December 16, 1995, defendant and his girlfriend, the complainant, were at a Christmas party at an acquaintance's home. During the evening, defendant became involved in a fight outside the home with three other people. Defendant came into the house "in a panic," without his shirt on, and told her to "get [her] stuff. We gotta go." During the ride home, which took about 45 minutes, defendant yelled and hit the dashboard, the window, and the seat beside him. When they were about 15 minutes from their home, defendant hit the complainant on the leg and the arm, and in the mouth, giving her a swollen lip.

At some time afterward, and before they arrived home, the complainant showed defendant her swollen lip. He pulled the car over, began to cry, said he was sorry, and calmed down. Very shortly after they returned home, the complainant played back the messages on a telephone answering machine, including a holiday greeting from a male

---

[1] The complainant and the investigating officer both testified at the hearing, and the 9-1-1 tape was played.

friend of hers. Upon hearing that message, defendant said, "That's not okay, that's just not okay." The complainant testified:

> "And then he walked off, and I went to erase the message on the machine, and when I walked into the back room, I saw the gun case in front of him and I heard a click and I just took off running, I didn't know what his intentions were. If he was mad at me, or just mad or if he was going to hurt himself, or me, or go back to the party."

The complainant ran to a neighbor's house, "somebody that had their lights on," asked to use the neighbor's phone, and called 9-1-1. The time between when the complainant heard the "click" and when she initiated the 9-1-1 call was approximately 30 seconds.

The entire 9-1-1 call took 4 minutes and 45 seconds. Because the complete content of the 9-1-1 call is central to our analysis, we reproduce the transcript of that call in its entirety:

> "DISPATCHER:   9-1-1, medical and police.
>
> "COMPLAINANT:   (Unintelligible) Louise (unintelligible, crying).
>
> "DISPATCHER:   Hold on! Hold on a minute! Is this Louise? Is this Louise? Is your name Louise?
>
> "COMPLAINANT:   (Unintelligible, crying).
>
> "DISPATCHER:   You need to stop crying, I can't understand what you're saying. Is your name Louise?
>
> "COMPLAINANT:   (Unintelligible) Tamara.
>
> "DISPATCHER:   Tamara?
>
> "COMPLAINANT:   Yeah.
>
> "DISPATCHER:   Okay. Are you at 17215 Southwest Merlo Road?
>
> "COMPLAINANT:   I'm at 1—I'm at —
>
> "DISPATCHER:   The address you're calling from is 17215 Southwest Merlo Road?
>
> "COMPLAINANT:   Yeah, I'm calling 9—175 —.
>
> "DISPATCHER:   17215.

"COMPLAINANT: I'm calling at 17295 Southwest Merlo Road.

"DISPATCHER: Okay. That's not the address that's on the 9-1-1 (unintelligible).

"COMPLAINANT: Oh no, I'm calling from a neighbor's house right now.

"DISPATCHER: Okay.

"COMPLAINANT: I'm sorry. I'm really scared.

"DISPATCHER: What is the problem?

"COMPLAINANT: Okay, my boyfriend has (unintelligible), like an, um, he's in shock right now, (unintelligible), he backhanded me (unintelligible), and hit my —

"DISPATCHER: Your boyfriend's what?

"COMPLAINANT: My boyfriend has backhanded me, I have a black lip right now.

"DISPATCHER: Okay, all right.

"COMPLAINANT: Um—(unintelligible)—we went to a party —

"DISPATCHER: Tamara, I don't need to know about that. What is the name of the complex that you're in?

"COMPLAINANT: I—there is no name.

"DISPATCHER: Are you calling from Louise's apartment?

"COMPLAINANT: No.

"DISPATCHER: The number on the phone that you —

"COMPLAINANT: I know, I'm calling from my neighbor's house.

"DISPATCHER: That's what I'm asking you.

"COMPLAINANT: Okay, I am calling from a neighbor's house.

"DISPATCHER: Uh-huh.

"COMPLAINANT: I'm trying to (unintelligible).

"DISPATCHER: Okay, this occurred —

"COMPLAINANT:    17295 Southwest Merlo Road.

"DISPATCHER:    Is that a house?

"COMPLAINANT:    That is like a duplex.

"DISPATCHER:    Okay.

"COMPLAINANT:    My boyfriend's living there. We went to a party, we're on the way home, he backhanded me, I have a black lip right now.

"DISPATCHER:    Do you need any medical attention?

"COMPLAINANT:    No, I think I'm gonna be okay, but he's still —

"DISPATCHER:    Tamara, I need to ask some questions, okay?

"COMPLAINANT:    Okay.

"DISPATCHER:    Are there any weapons in the house?

"COMPLAINANT:    Yes, he started to unload his gun. He was unloading it —

"DISPATCHER:    (Unintelligible).

"COMPLAINANT:    Let me finish —

"DISPATCHER:    No, let me answer—ask the questions, okay? He was unloading a gun?

"COMPLAINANT:    Yes.

"DISPATCHER:    Okay.

"COMPLAINANT:    There's a message machine, the guy said, 'I wanted to wish you a Merry Christmas, Tamara,' and Roy goes—that's my boyfriend that lives with me—he said, 'Oh, I can't have that.' And I saw him go to the back room and he started like to unload a gun.

"DISPATCHER:    Okay, is it a handgun or a rifle?

"COMPLAINANT:    I don't know, it's a big rifle, and I started to run out of the house. I said, 'Oh my God' (unintelligible).

"DISPATCHER:    Has he been drinking?

"COMPLAINANT:    Have I been drinking?

"DISPATCHER: Tamara, listen to me! Has he been drinking?

"COMPLAINANT: Yes, he has.

"DISPATCHER: Okay. Is he drunk?

"COMPLAINANT: I don't know that.

"DISPATCHER: What is his name?

"COMPLAINANT: Pardon?

"DISPATCHER: What is his name?

"COMPLAINANT: Roy. Roy Stonaker.

"DISPATCHER: Spell the last name for me.

"COMPLAINANT: S-t-o-n-a-k-e-r.

"DISPATCHER: And how old is he?

"COMPLAINANT: He's about 32.

"DISPATCHER: Do you know what his date of birth is?

"COMPLAINANT: He's 32.

"DISPATCHER: Do you know what his date of birth is?

"COMPLAINANT: Yes, um, June 27.

"DISPATCHER: What year?

"COMPLAINANT: I don't know. He's twenty—he just turned 32. I don't know. I'm sorry.

"DISPATCHER: That's okay.

"COMPLAINANT: You're yelling at me—I don't know—I'm kind of (unintelligible) —

"DISPATCHER: Tamara! Listen to me! Do you think he's going to hurt himself?

"COMPLAINANT: I don't know.

"DISPATCHER: Is that what you're afraid of?

"COMPLAINANT: I'm afraid he's going to hurt me and himself.

"DISPATCHER: Is there anybody else in the house besides him?

"COMPLAINANT: No. I ran out. I'm sorry.

"DISPATCHER:   That's okay.

"COMPLAINANT:   I feel bad for the neighbor —

"DISPATCHER:   Tamara, I want you to stay where you're at, okay? And we'll have an officer contact you there. What is the phone number into the house where he's at?

"COMPLAINANT:   649-8629.

"DISPATCHER:   Okay, you stay where you're at, okay?

"COMPLAINANT:   Okay.

"DISPATCHER:   You ask the neighbor what the address is there.

"COMPLAINANT:   Okay. [To neighbor]: What is the address here, honestly, I feel so bad.

"[Male voice in background]:   17215 Southwest Merlo.

"COMPLAINANT:   What is it?

"[Male voice]:   17215.

"COMPLAINANT:   17215.

"DISPATCHER:   Okay, I've got it, then. Number 3, right?

"COMPLAINANT:   (To neighbor): Number 3? Number 3.

"DISPATCHER:   Okay, you stay there, do not go back into the house, okay?

"COMPLAINANT:   Okay.

"DISPATCHER:   All right, we'll have somebody right there.

"COMPLAINANT:   Okay.

"DISPATCHER:   Thank you.

"COMPLAINANT:   Bye-bye."

No more than five minutes after the call ended, police officers arrived. The complainant told one of the officers, Deputy O'Donnell, that her boyfriend had "backhanded" her in the mouth while they were driving home and that, when they got home, her boyfriend became extremely upset

about a phone message she had received from a male friend. The complainant told the deputy that her boyfriend went into the bedroom, and she heard him "knocking around the rifle case" and then she ran out of the house.

The state moved to admit both the tape of the 9-1-1 call and the complainant's statements to O'Donnell, arguing that those hearsay statements, OEC 801(3),[2] were admissible as "excited utterances." OEC 803(2).[3] The state argued that *both* the backhand slap and the gun case incident were "startling events," for purposes of OEC 803(2), and that the complainant was under the "stress of excitement" caused by those events when she made the 9-1-1 call and when she spoke to O'Donnell.

Defendant responded that the 9-1-1 tape was not admissible because: (1) the complainant did not make the 9-1-1 call after defendant "backhanded" her, and therefore, her 9-1-1 call was not in response to that event; (2) even assuming that the gun case incident was a startling event, the complainant's statements were not spontaneous because they were made in response to direct questions from the 9-1-1 operator; and (3) in all events, the complainant's statements regarding the backhand slap did not "relate" to that event. Defendant further argued that, by the time the police arrived, the complainant was, according to both her own and the deputy's accounts, calm, and, therefore, was not "under the stress of excitement" caused by the previous incidents.

The trial court denied the state's motion:

"I'm not going to let the evidence in. And this, I'll try to explain my reasons to you. * * * The fact is these particular situations are so fraught with emotion that they're given to hyperbole. And I think you have to take that into consideration when you determine something ought to come in as an excited utterance.

"* * * * *

---

[2] OEC 801(3) provides:

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

[3] OEC 803(2) is set out in text below. 149 Or App at 737-38.

"[T]his witness is here, she's gonna be able to come and testify as to all the things that happened. So, I find that any prejudicial, any probative value would outweigh any prejudicial value on the one hand, and also would find that there was sufficient period for reflection where under the circumstances of this particular type of case, it shouldn't come in as an excited utterance.

"And also in listening to this witness talk on the 9-1-1 tape, she did start out crying, but she sort of calmly gave her address and as I said, relatively calmly reacted to information and prompting from the 9-1-1 operator which I thought might make a lesser person even more flustered than they were when they originally called in. * * * [A]s I view [O'Donnell's] testimony, taking into account what I [heard] on the tape, telling myself based on what the witness said, that she was calmer when she talked to the officer than she was on the line with the 9-1-1 tape, that she was to my mind calm enough so that what she told the officer shouldn't come in as an excited utterance."

The prosecutor asked the court why it found the 9-1-1 tape prejudicial, and the court explained:

"Well, if I admit, for example, evidence, if I admit the tape in evidence, then I've got evidence of bad conduct on the part of the defendant in terms of the maybe drinking, fighting and getting a gun. And that doesn't, at least the latter part of that doesn't relate to the assault and harassment charge, so it would be prejudicial against the defendant and wouldn't be probative on the assault and harassment charge."

The prosecutor then asked the trial court, "[W]hat reason is [the 9-1-1 call] not an excited utterance?" The court explained:

"Because I don't find that it meets the spontaneity requirements of excited utterances, and it is—I see some period of reflection and I see, as [defense counsel] pointed out, some very direct questioning that would take it out of the spontaneity that I would see that would be under excited utterance."

The state appeals, challenging both the trial court's exclusion of the 9-1-1 tape and the exclusion of the complainant's statements to O'Donnell. OEC 803 provides, in part:

"The following are not excluded by [OEC 802], even though the declarant is available as a witness:

"* * * * *

"(2)   A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

We review the admissibility of hearsay statements under OEC 803(2) as preliminary questions of fact. OEC 104(1);[4] *see State v. Carlson*, 311 Or 201, 216, 808 P2d 1002 (1991) (whether a statement is an excited utterance is a preliminary question of fact under OEC 104(1)). That is, in this case, the state, as the proponent of the evidence, must show by a preponderance of the evidence that the statements were excited utterances under OEC 803(2). *Carlson*, 311 Or at 216. On review, we view the record in this case in a manner consistent with the trial court's conclusion that these statements were not excited utterances. *See State ex rel OHSU v. Haas*, 325 Or 492, 498, 942 P2d 261 (1997) (in reviewing issue under OEC 104(1), the court views the record in a manner consistent with the trial court's ruling).

*Carlson* frames the inquiry:

"Three requirements must be satisfied for a hearsay statement to qualify as an excited utterance: (1) a startling event or condition must have occurred; (2) the statement must have been made while the declarant was under the stress of excitement caused by the event or condition; and (3) the statement must relate to the startling event or condition." *Carlson*, 311 Or at 215 (citation omitted).

Each prong of that test must be proven by a preponderance of the evidence. *Id.* at 216.

Before considering each of the three *Carlson* factors, we address a generic concern that seemed to underlie the court's exclusion of the 9-1-1 tape, *viz.*, that the statements

---

[4] OEC 104(1) provides:

"Preliminary questions concerning the * * * admissibility of evidence shall be determined by the court, subject to the provisions of subsection (2) of this section. In making its determination the court is not bound by the rules of evidence except those with respect to privileges."

were made in the midst of a domestic dispute, and such situations "are so fraught with emotion that they're given to hyperbole." That concern is inapposite. Indeed, to conclude that statements made while one is "fraught with emotion" are not admissible would judicially repeal the excited utterance exception itself:

> "Excited utterances are received against a hearsay objection * * * on the rationale that the excitement caused by the startling event or condition temporarily stills the capacity for reflection and thus produces statements free of conscious fabrication." *Carlson*, 311 Or at 215.

We note that the trial court's comments may well have echoed general concerns going to the excited utterance exception's very existence:

> "The entire basis for the exception is * * * subject to question. While psychologists would probably concede that excitement minimizes the possibility of reflective self-interest influencing the declarant's statements, they have questioned whether this might be outweighed by the distorting effect of shock and excitement upon the declarant's observation and judgment. Despite these questions concerning its justification, however, the exception is well established." 2 *McCormick on Evidence*, § 272, at 216 (4th ed 1992) (footnote omitted).

Whatever the abstract merits of such concerns, it is not for the trial court, or for us, to determine the desirability of the exception. Thus, to the extent the trial court relied on that ground for excluding the 9-1-1 tape, it erred.

We return to the *Carlson* criteria. The parties do not appear to dispute that both the alleged assault in the car and the gun case incident were, at least in the abstract, "startling events." The dispute, rather, centers on the second and third *Carlson* factors—*i.e.*, whether some, or all, of the complainant's statements were made while she was "under the stress of excitement caused by" either event and, if so, whether some, or all, of those statements "related to" that event. The trial court, without expressly determining that either event was "startling" for purposes of the rule, implicitly proceeded on the same premise.

With respect to *Carlson*'s second "spontaneity-of-the-utterance" factor, the state argues that the complainant's statements to the 9-1-1 operator were made while she was under the stress of *both* startling events: "[B]oth, at least cumulatively, were precipitating events and she was still under the stress of both when she called." The trial court, conversely, determined that the complainant was not under the stress of either event when she made the 9-1-1 statements. As discussed below, we conclude that, although the complainant was no longer under the stress of excitement caused by the alleged assault when she made the 9-1-1 call, she was under the stress of excitement caused by the gun case incident throughout that call.

In *Carlson*, the court explained:

> "The spontaneity-of-the-utterance requirement, *i.e.*, the requirement that the statement of the declarant be 'made while the declarant was under the stress caused by the event or condition,' has both a *causal* and a *temporal* dimension. The declarant's excitement must have been caused by the startling event, and the declarant's statement must have been made while the excitement persisted. * * * Criteria that bear on the trial court's determination of the spontaneity of the utterance are 'lapse of time, place, content of the utterance, physical or mental condition of the declarant, whether made in response to an inquiry, and presence or absence of a motive to fabricate.' " *Carlson*, 311 Or at 218 (citations omitted).

The trial court here found that the complainant's 9-1-1 statements were not spontaneous based on a permutation or combination of three factors: (1) the lapse of time between the incidents and the call; (2) the fact that the complainant answered the 9-1-1 operator calmly; and (3) the fact that the complainant's statements were in response to direct questions.

As to the first factor, the record indicates that approximately 17 minutes elapsed between the alleged assault in the car and the 9-1-1 call and that, during that period, defendant calmed down and apologized. The temporal lapse with respect to the gun case incident was dramatically different. The record indicates that the complainant called

9-1-1 within 30 seconds of the gun threat occurring. No significant lapse of time occurred. In contrast to the alleged assault, the time interval between the gun case incident and the 9-1-1 call did not permit substantial reflection on the complainant's part.

The second factor that the trial court emphasized was that the victim was "relatively calm" in responding to the 9-1-1 operator. Our review of the 9-1-1 tape confirms that the trial court could reasonably so characterize the complainant's voice and manner. The court's determination in that regard, whether characterized as a "finding" or otherwise, is pertinent to the "physical or mental condition of the declarant." *Carlson*, 311 Or at 218. However, the complainant's apparently calm affect must be assessed in the totality of other uncontroverted circumstances shown in this record. In particular, it is beyond dispute that the complainant was sobbing and incoherent at the beginning of the 9-1-1 call. It is also beyond dispute that the complainant's manner became calmer only after the 9-1-1 operator told her to "stop crying" and thereafter twice told her, "Listen to me!"

The third factor on which the trial court relied—that the complainant's statements were made in response to the 9-1-1 operator's direct questioning—is, again, specifically mentioned in *Carlson*. 311 Or at 218. However, as with the complainant's ostensibly calm demeanor, the "response-to-inquiry" factor must be viewed in the totality of the circumstances. Here, it is apparent that, because of the question-and-answer format of the 9-1-1 call, many of the complainant's statements were, of necessity, given in the form of a response. However, many of the complainant's most descriptive statements concerning the alleged assault and gun case incidents were not, in fact, "responsive"—that is, they included volunteered information that was not responsive to the question asked. *See* 149 Or App at 732-33.[5] Moreover, the strength of the "response-to-inquiry" factor may vary depending on the nature and context of the inquiry;

---

[5] Defendant argues that the statements regarding the gun were clearly in response to the operator's question as to whether there were firearms in the house. However, the context in which that occured indicates that the response was not the result of reflective thought. The complainant told the operator that she didn't need medical attention, "but he's still —," at which point the operator interrupted her

here, the complainant's initial description of the alleged assault followed the operator's open-ended question, "What is the problem?"

We note, moreover, that the factors the trial court identified are not the only factors established in this record that are material to the spontaneity-of-the-utterance requirement. In particular, there is uncontroverted evidence that: (1) the complainant made the 9-1-1 statements after she saw her boyfriend angrily open a gun case in response to a phone message that she had received from another male friend; (2) the complainant made the statements immediately after she had fled her own home late at night and had run to the next nearest house with lights still on; (3) the complainant was initially incoherent and in tears; and (4) the complainant indicated more than once, and without prompting from the 9-1-1 operator, that she was scared.

■ Applying the standard of review announced in *Carlson*, to the record as a whole, we conclude that the trial court correctly concluded that the complainant's statements to the 9-1-1 operator were not made while she was under the stress of the alleged "backhand" assault. The temporal lapse, the nature of the intervening interaction between the complainant and defendant, and, particularly, the fact that the complainant did not attempt to call 9-1-1 immediately after returning home but, instead, made that call only after the gun case incident, are especially pertinent to that conclusion.

■ Conversely, we conclude that the complainant was still under the stress of the gun case incident not only when she initiated the 9-1-1 call, but throughout that call. That conclusion, based on *Carlson's* "preponderance of the evidence" standard, flows primarily from our disagreement with the trial court as to the weight to be given to the complainant's "calm" affect and the "response-to-inquiry" factors, when those factors are viewed in the entire context, as well as

---

and asked whether there were weapons in the house. The complainant immediately replied that he was "unloading a gun" and was again interrupted. The complainant, in fact, became angry with the operator for not letting her finish her story. The whole tenor of the statements suggests that the operator's questions did not *enable* the complainant to reflect on the incidents but, instead, simply interrupted her nonreflective narrative.

from our assessment of the additional circumstances detailed above.

We turn, then, to *Carlson's* final element—whether the complainant's 9-1-1 statements "relat[ed] to the startling event," *viz.*, the gun case incident. All of the complainant's statements describing the gun case incident obviously satisfy that requirement. Consequently, the inquiry narrows to whether the complainant's statements describing the alleged "backhand" assault are also sufficiently related to the gun case incident to be admissible. We conclude that they were.

No Oregon decision has addressed the scope and content of the "related to" requirement. However, a leading commentator has observed with respect to the identically worded federal rule: "If the subject matter of the statement is such *as would likely be evoked by the event*, the statement should be admitted."[6] 5 *Weinstein's Federal Evidence*, § 803.04[5] (2d ed 1997) (emphasis supplied; footnote omitted).

We find that view to be persuasive. Applying that principle to this case, we conclude that the complainant's statements regarding the alleged assault were sufficiently related to the gun case incident. That conclusion flows primarily from our belief that, given the assaultive character of the two incidents and the relatively short time period between the two—approximately 15 minutes—the latter was "likely to evoke" the former. That is, in the first incident, defendant, provoked by anger, assaulted the complainant; and in the second, precipitating incident, defendant, again provoked by anger, engaged in actions that suggested to the complainant that he intended to harm her *again*. Indeed, the facts strongly suggest that the complainant reacted to the "click" in the manner she did largely because of the earlier alleged assault. Thus, complainant's statements describing

---

[6] McCormick also states that the "terminology is intended to extend beyond merely a description or an explanation of the event." 2 *McCormick on Evidence*, § 272, at 220. As an example of that principle, McCormick cites *People v. Ojeda*, 745 P2d 274 (Colo App 1987), in which the court found admissible a statement by the victim regarding a conversation with the defendant that had occurred five months before the attack. In that conversation, the defendant learned that the victim would be alone. The court concluded that the memory of that conversation would likely have been evoked by the attack. 2 *McCormick on Evidence*, § 272, at 220-21 n 34.

the earlier alleged assault were "relat[ed] to" the startling event.

Finally, with respect to the 9-1-1 call, defendant argues that, regardless of whether the statements in that call constituted excited utterances, the trial court should nevertheless be affirmed on the basis of its alternative ruling that the danger of unfair prejudice to defendant from admitting the 9-1-1 tape substantially outweighed the tape's probative value. OEC 403.[7] In so ruling, the court explained that although the statements regarding the gun were relevant to the menacing charge, they were not relevant to the assault and harassment charges, and would merely inform the jury of a subsequent "bad act" by defendant.[8] The state responds that, given that the three counts were to be tried together, there was no unfair prejudice.

■    The state is correct. The "prejudice" that would arise from the jury being exposed to evidence pertaining to the other charged acts is no different from that which generally inheres in every case in which joinder is permitted.[9] Thus, no legally cognizable prejudice outweighed the probative value of the tape, which represented the complainant's most immediate description of, and reaction to, the alleged crimes. The trial court erred in excluding the 9-1-1 tape.

■    Finally, we consider the trial court's exclusion of the complainant's subsequent statements to the investigating officer, O'Donnell. In concluding that those statements were not admissible under the excited utterance exception, the court found, and emphasized, that, by the time the complainant spoke to O'Donnell, she was calmer than she had been in speaking to the 9-1-1 operator and that an additional three to five minutes had elapsed. Without elaborating unduly, we

---

[7] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[8] The trial court did not state, and defendant does not argue, that the facts regarding the incident in the car were irrelevant to the menacing charge, which was based on the gun case incident.

[9] Defendant did not move to sever the counts for separate trials.

conclude that, given those facts, as found by the trial judge, as well as the additional fact that complainant had already spoken to the 9-1-1 operator about the same events, her statements to O'Donnell did not meet the second, "spontaneity" requirement.[10] Accordingly, the trial court properly excluded those statements.

Suppression of 9-1-1 call statements reversed and remanded; otherwise affirmed.

---

[10] Cf. *State v. Apperson*, 85 Or App 429, 432-33, 736 P2d 1026 (1987) (statements that the complainant made to police officer regarding the defendant's assault were not admissible under the catchall exception of OEC 804, where the complainant had talked to her mother twice and to another officer once between the incident and her statements to the officer who testified, and where the complainant testified that she could not remember defendant assaulting her).