Argued and submitted June 30, reversed and remanded in part; otherwise affirmed
September 23, 1998

## STATE OF OREGON,
*Appellant,*

*v.*

## CORNELIUS KEY DAVIS,
*Respondent.*

(96051015; CA A96575)

967 P2d 485

Kaye E. Sunderland, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Stephen J. Williams, Deputy Public Defender, argued the cause for respondent. With him on the brief was Sally L. Avera, Public Defender.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

**EDMONDS, J.**

Defendant is charged with the intentional homicide of Carrie Hammock. ORS 163.115. The state seeks reversal of a pretrial order excluding evidence of defendant's prior acts of violence against Hammock and statements made by her and defendant during and regarding those incidents. ORS 138.060(3). The trial court excluded the evidence under OEC 404(3) and OEC 802. The state argues that the evidence is relevant and is either nonhearsay or falls within a hearsay exception. We affirm in part and reverse in part.

For purposes of the trial court's pretrial rulings, the state offered the following evidence: Hammock died of a bullet wound to her forehead on May 7, 1996, in the residence where defendant was staying. Defendant and Hammock had been arguing. Defendant had a gun with him when he and Hammock went into the bathroom of the residence. Defendant was heard to shout, "No, don't Carrie; please don't!" Then a shot was heard. Defendant exclaimed, "Oh my God, oh my God!" The state expects that defendant will argue that Hammock shot herself either intentionally or accidentally.

The contested evidence, which the state wishes to offer, can be categorized chronologically by events occurring in 1992, 1993, 1994, early 1995, the fall and winter of 1995-96, March 1996, and April 1996.[1]

*1992*: Carrie Ward lived with Hammock when Hammock first began dating defendant. Ward was in the room during an argument between defendant and Hammock and saw defendant grab and push Hammock.

*1993*: Chelsie Buchanan-Gable testified about several events occurring in 1993.[2] During one incident, she saw pushing and heard yelling between Hammock, defendant

---

[1] The testimony about when the incidents occurred is not consistent among the witnesses. Some of the witnesses said they that they could not determine within any more than a period of a year or several months exactly when they spoke with Hammock or made their observations. For purposes of this opinion and to aid in the identification of the events for analysis, we will assume that the time periods identified are accurate.

[2] Without evidence in the record to the contrary, we will assume that the testimony refers to separate events.

and another woman. This incident apparently took place in a neighbor's yard. Afterwards, Hammock came to Buchanan-Gable, crying and "really scared." Hammock told Buchanan-Gable that defendant and the woman had just pulled a gun on her. Buchanan-Gable also testified that, when Hammock was pregnant, she noticed bruises on Hammock for the first time. She asked where they came from, and Hammock replied that she had received them from defendant hitting and grabbing her.

Buchanan-Gable also testified that from 1993 through 1996 she saw bruises on Hammock quite often. She said that on a couple of those occasions, Hammock told Buchanan-Gable that the bruises were from defendant hitting her and "that she was scared of him."

*1994*: On May 17, Officer Martinez responded to a dispute between Hammock and defendant over a car. He testified that, at that time, she seemed very nervous and scared. She told Martinez that she and defendant had been arguing and that defendant had assaulted her. At the time, Hammock refused to press charges. Ten hours later, Hammock spoke with Martinez at the police station and gave him a detailed description of the assault:

> "[S]he said that [defendant] and her were in an argument and he became very violent as the argument progressed at what time he grabbed her shoulder and she grabbed apparently some beads or a necklace that was on his neck. At that point he had clenched his fist and she was on the bed, he was trying to get to her while she was on bed and she used her feet to keep him away. And while she was doing that she had knocked over a TV which was on a stand nearby and he had made the comment to her * * * 'Oh, trying to hit me with the TV,' and at that time he had picked up the TV and was holding it over his head, holding it over her like he was going to throw it on her, and at that time he threw the TV down on the table breaking the TV and the table. * * * After the TV had been thrown down [defendant] started pulling Mrs. Hammock by the hair and he started slamming her head into the floor. He had done that several times and while she was lying on the floor he had cut an electrical cord from a nearby heater and he had made a knot in the cord and started striking her with the cord. The more

she screamed the more he began to or kept hitting her with the cord."

Martinez observed marks on Hammock consistent with her description about how the assault occurred.

Later, Officer Shanks arrested defendant for the incident. He testified that defendant told him that he had argued with Hammock about her taking their child away from him. He said that Hammock threw a television at him. Without elaborating, he also told the officer that he needed to teach her a lesson for "degrading" him. When asked about the marks observed on Hammock, defendant explained that she liked "weird sex," which included him hitting her with a chair leg and an electrical cord. Also, Deborah Hoskinson testified that Hammock told her that defendant had beaten her with an electrical cord. Marisa Bishop testified that Hammock had come over to her house upset with welts on her arms. Afterwards, Hammock told Bishop that she had been hit with a cord.

*Early 1995*:   When Hammock was pregnant with twins, Hoskinson noticed "really dark bruises" on her arms. Hammock told Hoskinson that defendant had inflicted the bruises.

*Fall 1995 - Winter 1996*:   Michelle Trask testified about an event that occurred sometime between September 1995 and March 1996. Trask heard Hammock and defendant arguing loudly when she went up to the door of the house where they were staying. As Trask stepped inside, she saw Hammock falling down the last three stair steps and landing on the floor. Defendant quickly came down the stairs, stood over her and said he was sorry. Trask and Hammock went immediately out to Trask's car where Hammock told her that she was pushed down the stairs. Around January 1996, Laura Yother noticed that Hammock had a black eye. When she asked about the eye, Hammock said that defendant had hit her.

*March 1996*:   Hammock made a call to the police station to which officers Fiala and Fitzwater responded within a couple of minutes. Crying and upset, Hammock told Fiala that she and defendant had argued over the children

visiting with his mother. She reported that during the argument, defendant had hit her and that she had pushed him back, resulting in further physical contact by both. Fiala observed a red bump on Hammock's lower leg and a mark on her lower back that she attributed to the altercation. At the same time, Fitzwater spoke with defendant. Defendant told him that he and Hammock had been arguing because she had threatened to kick him out of their residence and not to let him have contact with their children. Defendant admitted to Fitzwater that a physical altercation occurred, and the officer observed a scratch on defendant's rib area.

Also during March 1996, Yother saw defendant grab Hammock's hair while defendant and Hammock were fighting. In addition, Trask saw that Hammock had bruises on her thigh and her upper arms and that she had two black eyes. Hammock told Trask that she had been fighting with defendant because he wanted money from her and that he had held her down and hit her.

*April 1996*:   One of Hammock's and defendant's children died in the month before Hammock's death. Buchanan-Gable stayed at their home for a short period after the child's death. During that time, she heard yelling and hitting coming from the room where Hammock and defendant were. She heard defendant say "I cared about the baby too, and it was your fault." Afterwards, she heard Hammock crying. Buchanan-Gable saw bruises on Hammock's legs and arms at the child's funeral.

Approximately two weeks before Hammock's death, a neighbor saw defendant pulling Hammock by her hair while she was yelling and struggling. The neighbor, Leanna Tackett, was present when the police responded, and Hammock told defendant that she was going to get a restraining order and that he was "out of here." Tackett observed a bump on Hammock's head and that her face was red. Hammock said that she received it from defendant pulling her by her hair. Tackett also testified that Hammock told her, "that from her friend she found out that [defendant] was running around telling everybody that she, that he said that she thought—well he said that it was her fault the baby died."

About a week later, Ward saw defendant grab Hammock's arm while defendant was arguing with Hammock. Afterward, Hammock told her that the bruises that Ward observed on her upper arm were caused by defendant.

The trial court's order in this case is the result of a motion by the state seeking a pretrial ruling as to the admissibility of the above evidence. Defendant objected under OEC 802[3] and OEC 404(3).[4] After hearing all of the testimony and the parties' arguments, the trial court ruled:

> "1. The testimony of Leanna Tackett as offered at the pre-trial hearing, is admissible to show both the victim's state of mind to rebut a suicide argument, and to show intent on the defendant's part. Accordingly, the State's motion as to the testimony of Leanna Tackett is allowed.
>
> "2. As to all other subjects of the state's motion, including the State's supplemental request, the State's motion for admissibility of evidence is hereby denied."

The correctness of the trial court's first ruling is not at issue on this appeal. However, the state assigns error to the trial court's second ruling relating to defendant's past abuse of Hammock and the statements relating to those incidents.

Any single valid ground for defendant's objections will support the trial court's ruling. We will address first whether any of the evidence is admissible under OEC 404(3), because that ruling is dispositive regarding most of the evidence. The state asserts that evidence of defendant's physical abuse of Hammock is admissible under OEC 404(3) to show motive, intent and absence of an accident or a suicide. Defendant argues that the evidence is not relevant to anything that occurred at the time of Hammock's death.

---

[3] OEC 802 provides that "[h]earsay is not admissible except as provided in [OEC 801 to 806] or as otherwise provided by law."

[4] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Evidence of prior bad conduct is not admissible under OEC 404(3) to show that defendant acted in conformity with his bad character on the day that Hammock was shot. In *State v. Pinnell*, 311 Or 98, 106, 806 P2d 110 (1991), the court explained the reasoning underlying that rule:

> "The propensity rule's general prohibition of bad character evidence, codified in OEC 404(2) and OEC 404(3), is a specific application of OEC 403. The theory is that the risk that the jury will convict for crimes other than those charged, or because the accused deserves punishment for his past misdeeds, outweighs the probative value of the inference that 'he's done it before, he's done or will do it again.' Weinstein & Berger, Weinstein's Evidence Manual 7-6, ¶ 7.01[01] (Student ed 1987)." (Footnote omitted.)

We are mindful that our analysis in this case is limited by the nature of the state's motion seeking a pretrial ruling on the admissibility of the above evidence. The motion is based on the position that the state expects defendant to take at trial. OEC 401 tells us that evidence is "relevant" when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Consequently, the trial court was and we are constrained in our rulings by the purposes for the evidence advanced by the state in anticipation of what it believes will be defendant's position at trial. Thus, for purposes of the pretrial ruling, the issue is whether the contested evidence is relevant to prove that it is more probable that defendant shot Hammock rather than that Hammock shot herself intentionally or accidentally. Additionally, the state has the burden of proof to show that defendant acted intentionally, and it is entitled to a pretrial ruling on the admissibility of evidence for that purpose.

■ In this case, evidence of motive is relevant to prove that defendant killed Hammock and to disprove that her death was self-inflicted. Evidence of motive is one of the exceptions under OEC 404(3) to the general prohibition against the inadmissibility of character evidence through the offering of evidence of prior bad acts. When evidence of a defendant's motive is offered through evidence of prior bad acts under OEC 404(3), *State v. Johns*, 301 Or 535, 725 P2d

312 (1986), requires a trial court to apply five criteria[5] in an assessment of relevance and a sixth criterion that assesses the probative value of the prior bad act evidence against the danger of unfair prejudice. *State v. Moen*, 309 Or 45, 67-68, 786 P2d 111 (1990). In *Moen,* the court held that the trial court correctly applied the *Johns* criteria to evidence about motive, noting that the state had the burden of proving that the defendant's acts were intentional and that evidence of a hostile motive is in turn probative of intent. *Id.* at 68. In *State v. Pyle*, 155 Or App 74, 963 P2d 721 (1998), we applied the *Johns* criteria to determine the relevance of prior assaults on the victim and on defendant's ex-wife to the issue of whether the defendant was able to form the requisite intent to murder the victim. In that case, the defendant did not claim that he shot the victim accidentally. Rather, the state anticipated that he would assert that he was under the influence of an extreme emotional disturbance when he shot her. Because some of the prior assaults had been committed by the defendant with his fists, we held that those particular events were not relevant to the issue of his intent. The killing of the victim with a gun was so dissimilar to the earlier assaults as to render them irrelevant. That reasoning applies here. The evidence that defendant had physically abused Hammock in the past does not make it more probable that on May 7, 1996, he shot her with a gun. Under the circumstances of this case, the prior abuse evidence demonstrates only that he was the sort of person who was physically abusive.

■  On the other hand, evidence tending to show defendant's motive to kill Hammock is relevant to the pretrial issue before the trial court in this case because it makes it more probable that he shot her. The testimony concerning events in 1992, 1993, 1994 and 1995 do not give rise to any

---

[5] Those criteria are:

"(1) Does the present charged act require proof of intent?

"(2) Did the prior act require intent?

"(3) Was the victim in the prior act the same victim or in the same class as the victim in the present case?

"(4) Was the type of prior act the same or similar to the acts involved in the charged crime?

"(5) Were the physical elements of the prior act and the present act similar?" *Johns,* 301 Or at 555-56.

reasonable inference regarding a purported motive for defendant to shoot Hammock in May 1996. However, by March 1996 and thereafter, there is evidence that Hammock was threatening to kick defendant out of their residence and to prevent him from visiting with their children. Later, one of their children died, and the parties separated. All of this evidence could be relevant to prove that defendant had a motive to kill Hammock in May 1996. We hold that the March 1, 1996, incident testified to by Fiala and Fitzwater is admissible under the initial *Johns'* criteria. For the same reason, Buchanan-Gable's testimony regarding that time period is also admissible.

Yother's and Trask's testimony about their observations in March 1996 are not probative on the issue of motive. The events described are dissimilar to the May 7 incident involving a gun. The same reasoning applies to Ward's testimony about what occurred in April 1996. The trial court did not err in excluding that evidence.

■■ Defendant also objects to the evidence on the ground of hearsay. OEC 802. OEC 801(4)(b) provides that a statement is not hearsay if the statement is offered against a party and is that party's own statement. The statement by defendant that Buchanan-Gable heard is admissible under OEC 801(4)(b). Defendant's statements to Fitzwater are admissible for the identical reason.

■■ Regarding Hammock's statement to Fiala, the state argues that it is admissible because it is an excited utterance, an exception to the hearsay rule under OEC 803(2).[6] Fiala's contact with Hammock occurred "a couple of minutes" after she called the police. Fiala testified, "[s]he was very upset and crying when I interviewed with her." He said that as the interview progressed, she continued to be upset and rather

---

[6] OEC 803(2) provides that "[t]he following are not excluded * * * [a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Contrary to defendant's assertion, the state preserved the issue of admissibility under OEC 803(2) through its oral argument at the pretrial hearing, even though the trial court did not address the argument in its order or letter opinion. *State v. Engweiler,* 118 Or App 132, 135, 846 P2d 1163 (1993). The state met its burden of explaining to the trial court how each statement satisfied the requirements of OEC 803(2) through its questioning of witnesses and its closing argument.

than responding to questions from him, "[s]he was upset and just letting it all out." Fitzwater testified that when asked about Hammock's demeanor, "[s]he was really upset." Excited utterances are considered trustworthy because they are responses to startling events for which there is no time for reflection. *State v. Carlson*, 311 Or 201, 218, 808 P2d 1002 (1991). We conclude that Hammock's statements to Fiala meet the requirements of OEC 802(3) and are admissible on that ground.

In summary, we affirm the trial court's ruling excluding evidence of the events that occurred before March 1996. We also affirm its ruling regarding the testimony of Yother and Trask about events in March 1996 and Ward's observations made in April 1996. The testimony of Fiala and Fitzwater is relevant, as is the testimony of Buchanan-Gable regarding her contacts with Hammock in April 1996. On remand, the trial court must consider whether it is required to apply the sixth criterion of *Johns* under OEC 404(3), a determination that it did not need to reach when it ruled that the evidence was not relevant,[7] as well as other issues that may arise.

Reversed and remanded as to testimony of Fiala, Fitzwater and Buchanan-Gable pertaining to events in April 1996; otherwise affirmed.

---

[7] The parties do not raise to us any issue under OEC 404(4) as amended by the 1997 Legislature.