Argued and submitted August 7, 2001, reversed and remanded February 6, 2002

# STATE OF OREGON,
*Respondent,*

*v.*

# BRADLY MORRIS CUNNINGHAM, SR.,
*Appellant.*

# C930434CR; A87792

40 P3d 1065

Kathleen M. Correll argued the cause for appellant. With her on the briefs was Michael D. Curtis.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Edmonds and Wollheim, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Defendant appeals his conviction for murder. ORS 163.115. On appeal, he raises 32 assignments of error. We conclude that one of defendant's assignments of error, concerning the admission of hearsay evidence, constitutes reversible error. We do not reach defendant's other assignments of error.[1] We reverse and remand.

■ On appeal from a judgment of conviction, we view the evidence presented at trial in the light most favorable to the state. *State v. Charboneau*, 323 Or 38, 40-41, 913 P2d 308 (1996).[2] Because the hearsay statements at issue in the dispositive assignment of error are central to the case against

---

[1] Defendant represented himself at trial. A number of the assignments of error in this case pertain to issues that arose due to the way the defense was conducted. Another assignment of error pertains to the manner in which the trial court conducted a mid-trial competency proceeding to determine whether defendant was competent to continue to stand trial. Those issues are unique to the way the case was tried in the first instance, and do not present the types of issues that we would nevertheless address on the ground that they are likely to arise on retrial. One of defendant's assignments of error, concerning the foundation laid for the admission of DNA evidence, does have potential to arise on retrial. However, the trial was held in 1994. (For reasons not pertinent to the merits of the appeal, defendant's opening brief was not filed until late 1999, and the case was not submitted to this court until August 2001.) Given the advances in DNA science since the 1994 trial, it would be mere speculation on our part to assume that the state would present the same foundation, or even necessarily the same evidence, on retrial. Defendant's remaining assignments of error do not merit discussion.

[2] *Charboneau*, a death-penalty case, involved myriad assignments of error pertaining to, *inter alia*, the admissibility of portions of a plea agreement and the admissibility of the defendant's statements to investigating officers. In introducing its summary of facts, the court stated, "We view the evidence adduced at trial in the light most favorable to the state, because the jury found defendant guilty." 323 Or at 40-41. The court did not purport to limit or qualify that "light most favorable" statement contextually; that is, the court did not suggest that that principle might vary, depending on the nature of the assignment of error being reviewed (*e.g.*, exclusion of evidence versus denial of a motion for judgment of acquittal). Nor did the court discuss how that standard applies when assessing whether error is harmless. Indeed, in *Charboneau* itself, the court determined that evidentiary error was not harmless with respect to the defendant's conviction for aggravated murder, but did so without revisiting the "light most favorable" preface to the summary of facts. *Id.* at 50.

Logically, the "light most favorable" overlay cannot, and should not, be universally applicable. Clearly, it does apply to appellate review of the denial of a motion for judgment of acquittal (or directed verdict in civil actions). Conversely, it must be inapplicable to our review of whether an appellant's requested jury instructions are supported by *any* evidence in the record. *See, e.g., State v. Naylor*, 291 Or 191, 196-98, 629 P2d 1308 (1981) (assessing harmlessness of failure to instruct jury on lesser included offense in light of defendant's evidence which, if believed by

defendant, we provide, in particular, a detailed statement of the facts relating to those statements.

The victim, defendant's estranged wife ·Cheryl Keeton Cunningham, was murdered on September 21, 1986. Defendant and the victim met and married in Seattle in the late 1970s, when she was a law student and he was a banker. After her graduation, she joined a Seattle law firm. Shortly thereafter, defendant became involved in a large real estate development project in Texas and, in the early 1980s, the family moved to Texas. The project encountered difficulties, and the family filed for bankruptcy as a result. The victim subsequently returned to Seattle to work for the same law firm, while defendant remained in Texas. In 1985, the victim transferred to the firm's Portland office, and defendant also moved to Oregon and went to work for a savings and loan association. Defendant and the victim purchased a home in Gresham. However, the marriage was deteriorating, and defendant eventually moved out of the family home.

---

jury, could have supported conviction on the lesser offense). Further, and most obviously, the determination of whether the erroneous admission or exclusion of evidence is harmless may need to be based on a review of the *entire* record—and not just those portions most favorable to the respondent. *See Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986) ("[W]e have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt."); *State v. Walton*, 311 Or 223, 231, 809 P2d 81 (1991) (discussing difference between state and federal constitutional standards in this respect).

The "light most favorable" statement in *Charboneau* is followed by a citation to *State v. Tucker*, 315 Or 321, 325, 845 P2d 904 (1993), which, in turn, cites *State v. Stevens*, 311 Or 119, 121, 806 P2d 92 (1991), for the "light most favorable" principle. *Stevens* cites *State v. Brown*, 310 Or 347, 350, 800 P2d 259 (1990), and *Brown*, finally, cites *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989). In *King*, the court, in reviewing the propriety of the denial of the defendant's motion for judgment of acquittal, stated:

"In ruling on the sufficiency of the evidence in a criminal case, the relevant question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 307 Or at 332.

In sum, the "light most favorable" principle concerns the assessment of the sufficiency of the evidence to support a verdict—it is not a sort of "universal solvent" that provides the only standard applicable to assessment of the harmlessness of error. For purposes of this case, we begin, as a matter of general background, by reciting the facts supporting the jury's verdict. However, in our analysis of the evidentiary/hearsay issue that is central to our disposition and our assessment of whether the erroneous admission of hearsay was harmless, we describe all pertinent portions of the record.

In February 1986, the victim filed for divorce. The divorce proceeding was scheduled to go to trial in October 1986. In the period between when the victim filed for divorce and her murder, the interactions between the victim and defendant became increasingly acrimonious. Both parties sought custody of their three sons: Tyler, aged six, Travis, aged four, and Spencer, aged two. There were discussions of joint custody arrangements, and the parties agreed to an interim visitation schedule under which defendant would pick up the children on Friday evenings and return them to the victim's home on Sunday evenings.

In the spring of 1986, a psychologist performed a custody evaluation. He observed that defendant made contradictory statements, claiming to be the children's primary parent but also claiming that he worked very long hours at his job and admitting that he had not even lived in the same state with the children for a significant period of time. Defendant also told the psychologist that the victim did not like, and could not handle, the children. Defendant confided that he believed that his mother-in-law, the victim's mother, was planning to poison him and kidnap the children. For her part, the victim told the psychologist that defendant was harsh and inflexible with the children. The psychologist observed that, at a joint meeting with both defendant and the victim, the victim seemed intimidated and did not want to be alone with defendant, while defendant was "aggressive" and "bombastic." The psychologist concluded that the children seemed well-adjusted and happy with their mother and that the victim was the more appropriate custodian of the children because the children's needs were central to her life, whereas defendant had many other pursuits in which he was engaged.

In the summer of 1986, the victim consulted with a bankruptcy attorney with whom she worked because she was concerned that defendant had some assets that had not been disclosed in the couple's pending bankruptcy. The attorney told the victim about penalties that could result from a failure to disclose assets in a bankruptcy proceeding. The victim seemed anxious and fearful of retribution from defendant if she disclosed the assets.

Throughout the period from the divorce filing until the murder, defendant and the victim had numerous disputes about the children. In the spring of 1986, defendant and the victim had a loud fight at the children's preschool during which defendant became quite agitated. They also vehemently disagreed over where their oldest son, Tyler, would attend school in the fall. While the victim wanted to enroll Tyler in a school near her home, defendant resisted—and instructed the preschool not to forward Tyler's records to that school. When school began on September 2, the victim brought a friend with her to the school to try to keep defendant from interfering with the enrollment process. When defendant arrived at the school, he confronted the victim angrily, yelling at her. They never resolved their differences about Tyler's schooling.

On September 16, 1986, depositions were taken in the divorce proceeding. The victim's attorney tried to question defendant about the couple's taxes, which had not been filed for several years, and about the property that the victim believed had not been properly disclosed to the bankruptcy court. Defendant gave evasive answers. After the deposition, defendant was highly upset, telling friends that the victim had lied and that she was not a fit mother. He told one of his friends: "I'll kill Cheryl." Defendant's girlfriend, Hermens, testified that defendant was agitated after the deposition, and that he called the victim and told her that she would pay for lying at the deposition. The victim's brother overheard a telephone conversation between defendant and the victim on the evening of September 16 during which defendant called the victim a "dumb cunt" and stated: "I'll get you."

On September 18, 1986, the divorce court denied defendant's request for a lengthy set-over of the divorce proceeding. The trial was set over only one week.

On Friday, September 19, two days before the victim's death, defendant and Hermens came to the victim's house in the West Slope area of southwest Portland to pick up the children for weekend visitation. Defendant was irritated and accused the victim of having lied. He also told the victim about his suspicions of being poisoned. Later, defendant

made a statement to Hermens to the effect that, "when somebody killed one parent but the other parent wasn't convicted of something, being better off for children."

The children spent the weekend at defendant's apartment in the Madison Towers complex in southwest Portland. On Saturday, September 20, defendant took the children to a soccer game in which Tyler was playing. The victim also went to the game. When defendant saw the victim there, he became upset and took the children to the other side of the field because he perceived the victim's presence as an intrusion on his time with the children. The victim, who was also distraught because she couldn't speak with her children, told a friend that defendant did not want her at the game and that he had threatened her.

The victim was murdered some time between 8:00 p.m. and 8:30 p.m. on September 21. Earlier that evening, defendant, Hermens and the children went out for an early dinner because Hermens was scheduled to work that night. After dinner, defendant borrowed Hermens's car, saying that his vehicle was having some problems. He left Hermens at the hospital where she worked at about 6:40 p.m., saying that he had forgotten one of the children's blankets and that he was going back to the apartment before taking the children home to their mother. Defendant told Hermens that he would return to the hospital to visit her after he took the children home.

At 7:11 p.m., the victim made a telephone call from her home to her mother's home in Washington state. The victim told her mother that defendant had called to tell her that he wasn't able to return the children to her at 7:00 p.m. as arranged because he was having some gas problems with his vehicle. He would not tell the victim where he was. The victim was "hysterical" when she called her mother and suggested that she might call the police. From the victim's recounting of her conversation with defendant, her mother was under the impression that the children were out somewhere in a broken-down car.

At around 7:30 p.m., the victim also spoke on the telephone with her brother, who lived with her and the children but was away from home that evening. She was upset and

crying when she talked to him. She told him that defendant had not brought the children home yet and that he claimed to be having car trouble, which she described as a "typical maneuver."

At 7:59 p.m., the victim again called her mother. At trial, her mother recounted that conversation:

> "[S]he said, 'Mother, I want you to remember this. I'm going down to the Mobil station by the IGA store, ah, down the hill.' She said, 'And I'm going to meet Brad and pick up the children. And I want you to remember this.' She was real stern about it."

The victim's mother called her boyfriend over to the telephone and had the victim repeat the information so that he could hear it as well. Her mother suggested that the victim should not go alone to meet defendant, but the victim replied: "No, I cannot leave the kids in the car any longer. I have to go pick up my kids." The victim told her mother that she would call back when she returned.

During the course of the divorce, the victim regularly made contemporaneous notes of any conversations she had with defendant. After her death, notations in the victim's handwriting were found on a piece of paper at her house. The first notation on the paper read:

> "7:10 - 'I'm having gas problems.'
> pm
>
>       -I asked where boys were & said I'd pick them up.
>
>       -He says - 'I'll handle it & hangs up."

The second notation on the paper read:

> "8:00    SW Canyon Lane - IGA mkt
>       -at IGA - at Mobil (tho closed)"

Around 7:30 p.m., defendant called Hermens and told her that the victim was coming to the apartment to pick up the children. Between 7:30 p.m. and 7:35 p.m., one of defendant's acquaintances saw him in the Madison Towers parking garage. Defendant was walking toward the door of

the parking garage with his four-year-old son, Travis. Defendant was wearing "nice, casual attire," and had his keys in his hand. Hermens tried to call defendant at his apartment at 8:00 p.m. and again at 8:30 p.m., but he did not answer the phone.

According to Tyler, who was then six years old, after defendant and the children returned to the apartment that evening, they began to watch the movie, "The Sword and the Stone." Defendant left with Travis about half way through the movie, leaving Tyler and two-year-old Spencer alone.[3] According to Tyler, defendant returned to the apartment shortly after the movie ended and said that he had been jogging. Defendant went into the kitchen and washed dishes, and Tyler then began watching a part of the movie, "Rambo," on broadcast television. Given Tyler's description of the scene that was playing when he first began watching the later movie, the time was then between 8:53 p.m. and 8:58 p.m.

Hermens called defendant at 9:00 p.m., and defendant answered. His voice was high-pitched, his speech was rapid, and he was out of breath. He told Hermens that he had been downstairs waiting for the victim. At about 9:15 p.m., another resident of the apartment complex saw defendant enter the parking garage with a child about four or five years of age. Defendant wore shorts and a tee-shirt. He was barefoot, and his hair was wet.

Meanwhile, the victim had been murdered. Shortly after 8:00 p.m., a resident on a street that intersected the Sunset Highway—three tenths of a mile from the IGA store and Mobil station mentioned in the victim's note and telephone call—saw the victim's van across from his house, facing the freeway. That witness saw what appeared to be two people in the front of the van and a child in the back. After he went into his house, he heard some sounds, including the sound of a dog barking. Another resident on the same street was leaving for work around 8:00 p.m. and saw a van idling in the street facing the highway. He thought there was a man in the driver's seat. A third resident reported that, shortly after 8:00 p.m., she heard muffled banging or thumping from

---

[3] Travis did not testify at trial.

the area toward the front of her house, like a rubber hammer hitting something. A dog started barking. She looked out her window but did not see anything.

At about 8:30 p.m., the victim's body was found in her van. The van had traveled down the intersecting side street into the eastbound lanes of the Sunset Highway leading into Portland and crashed on the highway. A motorist on the highway stopped traffic and attempted to rescue the victim from the van. He found the victim head first on the passenger floorboard, with her feet on the driver's seat. The motorist also observed an infant car seat in the van and attempted to locate an infant, but failed to find one. He noted that the van was still running and that a purse had been stuffed onto the accelerator.

Paramedics arrived several minutes later and reported the victim dead on the scene. Investigating officers noted a substantial amount of blood spatter in the van. They also observed that the victim had numerous injuries that were not consistent with being caused by a vehicle accident.[4] They concluded that the victim had been murdered and that the murderer had attempted to cause a vehicular accident on the Sunset Highway and make it appear that the victim had died in the accident. An autopsy later showed that the victim died of head injuries. Both her upper and lower jaws were fractured, and there was evidence of approximately 25 blows.

Around 11:00 p.m. on the night of the murder, police officers went to defendant's apartment. When the officers told defendant that the victim was dead, he asked if she had been in a vehicle accident. Defendant told the officers that he had last seen the victim on Friday evening, two days before the murder, when he picked up their children for his weekend visitation with them. He stated that he had called the victim around 7:00 or 7:30 p.m. on the evening of the murder and told her he was running late and that the children were watching "The Sword and the Stone." He stated that he called the victim again about an hour later, and she said that

---

[4] A key on a cord also was found on the victim's arm. Investigators failed to identify the key.

she was going to come to his apartment to pick up the children. Defendant further stated that the only time he had left his apartment that evening was to put something in his car.

Early the next morning, September 22, defendant called the acquaintance who had seen him and Travis in the garage the previous evening, asking her if she recalled seeing him at 8:00 the evening before, carrying boxes. She replied that it had been 7:30 p.m., and that he had not been carrying boxes.

After the murder, defendant told his former girlfriend, Stevenson, that he had called the victim on the evening of the murder to tell her about his car trouble. He stated that the victim did not care that the children would not be returned because she had someone with her. He told Stevenson that he had decided to keep the children for the night because the victim was not interested in having them back and had been drinking. He also said that the victim had called him that evening demanding that he return the children, but he had refused. He told Stevenson that he had been out of the apartment with Travis to get a blanket from the car because the children would be spending the night. Defendant later told Hermens—contrary to what he had told her on the evening of the murder (*viz.*, that he had been downstairs waiting for the victim)—that he had been out of the apartment with Travis doing errands and putting shoes into his car.

In the days following the murder, defendant instructed staff at his office not to disclose information about his whereabouts to the police. He also expressed concerns that the victim's mother posed some sort of threat to him and the children. Defendant arranged for the children to be moved out of state. He spoke derisively of the victim after the murder, suggesting that she had probably been killed by someone she had picked up in a bar. Defendant told Hermens that the victim had been nasty to the children and that they would not miss her. Several days after the murder, Hermens observed a large bruise on defendant's left arm. Defendant said that he got the bruise on the day of the murder when playing at a park with the children.[5]

---

[5] Defendant's eldest son from a prior marriage, Brad, Jr., who returned from a camping trip some time after 9:00 p.m. on the evening of the murder, testified that he had observed no injuries on defendant that evening.

Defendant was tried on a charge of murder, in a trial lasting from October 27 to December 22, 1994. Before trial, defendant moved unsuccessfully to exclude the contents of the victim's telephone conversations with her mother on the evening of September 21, 1986, as well as the victim's written notes of the same date, as inadmissible hearsay.

At trial, the state presented evidence that it took less than 10 minutes each way to travel between defendant's apartment complex and the site of the murder. The state also presented DNA evidence that a hair found in the victim's van contained a cellular contaminant that was consistent with defendant's DNA, but also was consistent with the DNA of approximately 10 percent of the population. The jury convicted defendant, and he was sentenced to life imprisonment with a 22-year minimum sentence.

On appeal, defendant raises 32 assignments of error. For the reasons that follow, we conclude that one of those assignments is dispositive: The court erred in admitting the victim's mother's hearsay recounting of the victim's statements in their second telephone conversation on the evening of September 21, 1986, and that error was not harmless. Consequently, we reverse and remand for a new trial. As noted previously, *see* 179 Or App at 361 n 1, that disposition obviates any need to discuss defendant's other assignments of error.

■ We turn, then, to the hearsay issue. Defendant moved *in limine* to exclude as hearsay the victim's telephone calls to her mother on the evening of the murder and the notations in the victim's handwriting describing the same events that the victim described to her mother during those calls.[6] The trial court held that all of those items of evidence were admissible under OEC 803(2), which provides an exception to the general rule barring hearsay evidence. OEC 803 provides, in part:

"The following are not excluded by Rule 802, even though the declarant is available as a witness:

---

[6] In the trial court, defendant also challenged the admission of the contents of the victim's telephone conversation with her brother that evening on hearsay grounds. He does not pursue that argument on appeal.

"* * * * *

"(2)   A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

In holding that the statements were admissible, the court made the following findings:

"I find that the decedent was under the stress or excitement caused by the constantly escalating dissolution proceedings. Her conduct in the days and weeks leading up to this event demonstrates a much higher degree of stress and concern than is found even in difficult dissolution cases. Her emotional condition had deteriorated significantly, and I am satisfied the statements were made while Ms. Cunningham was under that stress.

"Next, the State must have a triggering event or incident just prior to the statements. I find that the sudden change in plans for delivery of the children from visitation with defendant is sufficient evidence of a triggering event. The statements made during the phone conversations and the notes written on the pad are directly in response to defendant's phone conversations with decedent that same day regarding the children and provide the second element of the rule.

"Finally, the statements made to each relative and the written notes relate to Ms. Cunningham's condition, *i.e.*, the stress from dealing with defendant and a highly acrimonious custody dispute."

Defendant argues on appeal that the trial court erred in ruling that the note and the recounting of the victim's telephone conversations with her mother, were admissible under OEC 803(2). As an initial matter, we address one of the state's arguments in response to defendant's contention, as it frames the way we approach the assignment of error. The state asserts that, because defendant moved *in limine* to exclude all of those hearsay statements, then "if any of these statements are admissible, they are all admissible." The state posits that, because defendant did not make separate legal arguments in respect to each hearsay statement, "[h]e cannot complain that the trial court did not rule on them separately." Thus, the first question we must address is

whether we are confronted with one hearsay problem, or four hearsay problems, or some number in between.

In support of its contention that this is properly viewed as one hearsay problem, the state cites *State v. Carlson*, 311 Or 201, 219, 808 P2d 1002 (1991), *State v. Brown*, 310 Or 347, 358-59, 800 P2d 259 (1990), and *State v. Hasson*, 153 Or App 527, 958 P2d 183 (1998). In *Carlson*, the question concerned the admissibility of a statement by the defendant's wife. While a police officer was investigating a domestic dispute involving the defendant and his wife, he inquired about needle marks on the defendant's arm. When the defendant said they were injuries he received while working on a car, his wife yelled: "You liar, you got them from shooting up in the bedroom with all your stupid friends." 311 Or at 203. In response to his wife's accusation, the defendant "hung his head and shook his head back and forth." *Id.* The court concluded that the wife's statement qualified as an excited utterance, and, in addressing the defendant's contention that the evidence of his reaction to his wife's statement was inadmissible, the court stated:

> "In stating his objection to the trial court, defendant did not segregate inadmissible portions of [the police officer's] testimony about defendant's nonverbal reaction from [the wife's] accusatory statement. An objection to evidence as a whole is insufficient as a basis for reversal on appeal when any part of the evidence objected to is admissible." *Id.* at 219.

The *Carlson* court relied on *Brown* for that proposition.

In *Brown*, the hearsay declarant had told an officer that she was giving the officer records of the defendant's drug-dealing activities and that she wanted the officer to use the records against the defendant to put him in jail because she felt the only way she would be safe was if the defendant were in jail. 310 Or at 357. The court concluded that the portion of the hearsay relating to the declarant's fear of the defendant was admissible under the state of mind exception found in OEC 803, and went on to state:

> "Assuming, without deciding, that the remainder of the quoted testimony was inadmissible, defendant still cannot prevail. In stating his objections to the trial court, he did

not segregate inadmissible portions of Anderson's statements from the admissible ones.

> " 'It is well established that when evidence is offered as a whole and an objection is made to the evidence as a whole and is overruled, the trial court will ordinarily not be reversed on appeal if any portion of the offered evidence was properly admissible, despite the fact that the other portions would not have been admissible had proper objections been made to such portions of the offered evidence.' *Sproul v. Fossi,* 274 Or 749, 755, 548 P2d 970 (1976)." *Brown,* 310 Or at 358-59.

Finally, in *Hasson,* the defendant "objected to the admission of [a 9-1-1 recording] and did not distinguish among the various statements that the victim had made during the 15 minutes of the conversation." 153 Or App at 531. We concluded that at least some of the statements on the tape qualified as excited utterances under OEC 803(2), and that the entire tape was admissible because the defendant had objected to the tape as a whole. *Id.*

In each of those cases, the objection was to an entire verbal exchange or conversation, and not aimed specifically at statements within the conversation. The rule invoked in those cases applies "when evidence is offered *as a whole* and an objection is made to the evidence as a whole[.]" *Sproul,* 274 Or at 755 (emphasis added). The two telephone conversations between the victim and her mother, which occurred almost an hour apart, cannot be viewed holistically in the manner of the various verbal exchanges at issue in *Carlson, Brown,* and *Hasson.* The telephone calls not only were separated in time, but the victim's demeanor differed in each telephone call. In fact, defense counsel noted in his argument on the motion *in limine* that the later telephone call, in particular, did not show the degree of excitement or agitation required of an excited utterance. We conclude that defendant's objections to the two telephone calls to the victim's mother must be treated as an objection to two separate items of hearsay evidence and analyzed accordingly.

The handwritten notations by the victim, on the other hand, are not subject to such differentiation. As noted, both notations in the victim's handwriting were written on

the same piece of paper. That piece of paper was "offered as a whole" item of evidence in the case. At the hearing on the motion *in limine*, defense counsel did not make any particularized arguments about the note beyond the generic argument set forth in the motion itself, much less any argument that the two different notations on the piece of paper should be analyzed as two separate pieces of hearsay evidence. We conclude that, given the lack of specificity of defendant's objection, the note is subject to analysis as a single item of evidence.

■    We turn, then, to the admissibility of those three pieces of hearsay—the victim's statements in the two telephone conversations and her handwritten notations—as "excited utterances" under OEC 803(2). We begin with the 7:11 p.m. telephone call. *Carlson* provides the framework for our analysis. The court in *Carlson* stated:

> "Three requirements must be satisfied for a hearsay statement to qualify as an excited utterance: (1) a startling event or condition must have occurred; (2) the statement must have been made while the declarant was under the stress of excitement caused by the event or condition; and (3) the statement must relate to the startling event or condition." 311 Or at 215 (citation omitted).

Concerning the first of those three requirements, the court went on to break it down into two sub-parts:

> "The 'startling event or condition' 'is the catalyst that shocks the witness' sense, thereby rendering the witness' resulting statement sincere and trustworthy.' Rice, *Evidence: Common Law and Federal Rules of Evidence* 517 (2d ed 1990). The 'startling-event-or-condition' prerequisite has two components: the occurrence of an event or condition and its startling nature. Whether an event or condition is sufficiently startling cannot be determined from the nature of the event or condition itself. For the purposes of the excited utterance exception, an event or condition is not inherently startling. The startling-nature component is a relational concept, *i.e.*, whether an event is sufficiently startling to qualify cannot be determined without focusing on the event's effect on the declarant." *Id.* at 216.

In assessing whether the requirements defined by the court in *Carlson* have been met, we view the record consistently with the trial court's ruling on a preliminary question of fact under OEC 104(1), accepting reasonable inferences and reasonable credibility choices that the trial judge could have made. *Id.* at 214.

■ Here, the trial court identified the "startling event" that immediately preceded the 7:11 p.m. telephone call as "the sudden change in plans for delivery of the children from visitation with defendant." The court did not find that such an event is *per se* a startling event. Rather, the court determined that, in the particular context—the escalating tensions of the divorce and custody dispute in the preceding days and weeks—defendant's call caused the requisite stress and excitement in the declarant/victim.

We agree that the trial court properly concluded that the telephone call from defendant constituted a startling event. According to the victim's mother, the victim was hysterical as a result of the telephone call from defendant. The telephone call did not just relay information that the children would not be returned on time; during the course of the call, defendant also refused to disclose the location of the children. The victim's mother had the impression that defendant had led the victim to believe that the children were somewhere in a broken-down vehicle. Given the context of the custody dispute, the trial court could reasonably conclude that the call did, in fact, cause the victim to experience the stress of excitement.

As to the second requirement, the *Carlson* court stated:

"The spontaneity-of-the-utterance requirement, *i.e.*, the requirement that the statement of the declarant be 'made while the declarant was under the stress caused by the event or condition,' has both a *causal* and a *temporal* dimension. The declarant's excitement must have been caused by the startling event, and the declarant's statement must have been made while the excitement persisted. OEC 803(2). *See State v. Moen*, 309 Or 45, 59, 786 P2d 111 (1990) ('OEC 803(2) * * * creates an exception to the hearsay rule for statements by a person laboring under the stress of an

event or condition which caused excitement'). Criteria that bear on the trial court's determination of the spontaneity of the utterance are 'lapse of time, place, content of the utterance, physical or mental condition of the declarant, whether made in response to an inquiry, and the presence or absence of a motive to fabricate.' " 311 Or at 218 (emphasis and ellipses in original; citations omitted).

In this case, the trial court determined that the victim's statements to her mother were made in response to a telephone call from defendant on the same day. Indeed, the time interval was much narrower than the same day. The victim was not expecting the children to be returned until 7:00 p.m. that evening. At 7:10 p.m., the victim made a notation about the contents of defendant's telephone call to her.[7] The victim made the call to her mother at 7:11 p.m. The time lapse between the startling event and the victim's statements to her mother thus was very short. There was little time for the victim to have engaged in reflective thought between her receipt of defendant's telephone call and her call to her mother about a minute later.

The content of the utterance, and in particular, the victim's indication that she was thinking of calling the police, indicate that the stress of excitement caused by defendant's telephone call had not dissipated when she spoke with her mother immediately thereafter. The victim was "hysterically upset" during the telephone call to her mother, which also indicates a mental condition consistent with the stress of excitement. *See, e.g., State v. Davis*, 156 Or App 117, 126-27, 967 P2d 485 (1998) (information imparted while declarant was upset and crying was "excited utterance"); *State v. Stonaker*, 149 Or App 728, 742, 945 P2d 573 (1997), *rev den* 327 Or 123 (1998) (information imparted while declarant was sobbing and incoherent was "excited utterance"). The victim's demeanor when she spoke with her mother, coupled with the close proximity in time between the startling event and the victim's statements to her mother, show that there was little time for the victim to have engaged in reflective thought.

---

[7] As discussed below, we conclude that that handwritten note was properly admitted into evidence.

Thus, we agree with the trial court that the second requirement is satisfied here.

The third condition is that the hearsay statement must relate to the startling event. That condition is satisfied here. The startling event was the telephone call from defendant; the hearsay statements in question relayed the contents of that telephone call, and also revealed that the victim was contemplating action—informing the police—about the startling event. The trial court correctly determined that the victim's first telephone call to her mother on the evening of the murder was admissible under OEC 803(2) as an excited utterance.

■ We turn next to the admissibility of the handwritten note. The analysis under the first prong of the test is the same for the first notation on the handwritten note as for the first telephone call to the victim's mother. We have already analyzed the startling nature of defendant's telephone call to the victim between 6:40 and 7:10 p.m., and the effect that it had on her, and need not repeat that analysis. The same is true of the third prong of the analysis—the first notation concerned defendant's telephone call to the victim between 6:40 and 7:10 p.m.

The second requirement—that the statement must have been made while the declarant was under the stress of excitement caused by the precipitating event—is, however, somewhat more complicated as applied to a handwritten note rather than to spoken statements. Defendant argues that, by its nature, a handwritten notation cannot be spontaneous. Defendant posits that the victim must have located a pen and paper and summarized her conversation with defendant in a conscious manner, which reveals a lack of spontaneity.

We disagree. We reject defendant's premise that writings are *per se* not spontaneous. To the extent that defendant presumes that the physical process of picking up a pen and writing obviates spontaneity, the same can be said of locating and picking up a telephone and dialing 9-1-1, yet we have held that statements made during 9-1-1 calls can be admissible as excited utterances. *See, e.g., State v. Hasson,* 153 Or App at 532; *Stonaker,* 149 Or App at 742. Consequently, we reject defendant's putative categorical approach

in favor of a particularized inquiry into the circumstances attending the written statement.[8]

We return, then, to the circumstances of this case. The state, as proponent of the writing, adduced evidence that the victim, a litigator by profession, routinely took notes of her conversations with defendant during the course of their divorce. Thus, the trial court could properly find, as a matter of foundational admissibility under OEC 104, that the victim's generation of the writing was reflexive and reactive, and not the product of conscious deliberation.

In addition, we know that the writing here was created near the time of the startling event, because the record demonstrates that the first notation was, necessarily, made in close proximity to the initial telephone call to the victim's mother.[9] The notation could only have been made after the victim spoke with defendant—sometime after 6:40 p.m.—and before she left her home at about 8:00 p.m. The record further establishes that the victim made the first telephone call to her mother at 7:10 p.m., and that, at that time, she was still highly upset by defendant's call. Combined with the victim's habit of contemporaneous note-taking, those circumstances amply support the trial court's determination that the initial notation was generated while the victim was still under the stress of excitement from the first telephone call.

As noted above, we treat the handwritten note as one piece of evidence. Consequently, because we have concluded that the first notation was admissible as an excited utterance and because defendant did not object separately to

---

[8] Presumably, if defendant's view were adopted, a scrawled note from a bank teller saying, "Help! He's got a gun!" would not be admissible as an excited utterance. The same would be categorically true of all e-mail messages. Again, the admissibility of such statements, regardless of the mode of communication, is best assessed on a case-by-case basis. Parenthetically, our search of the law of other jurisdictions has yielded very little concerning the admissibility of notes as excited utterances. *See, e.g., State v. Smith*, 285 So2d 240 (La 1973) (notation by a witness to a robbery of the license plate number of the perpetrator's vehicle was admissible as an "excited utterance").

[9] In general, a writing is unlike an oral statement in that the latter has a recipient who can put the statement within a time frame and can provide information about the hearsay declarant's demeanor—*e.g.,* crying, upset, shouting, etc.—and the former does not.

the latter notation, the entire handwritten note was properly admitted into evidence.

■        We turn, finally, to the third item of hearsay evidence admitted as an excited utterance—the victim's mother's recounting of her daughter's oral statements during the second telephone call, made at 7:59 p.m. For the reasons that follow, we conclude that the trial court erred in determining that the victim's statements at that time satisfied *Carlson*'s first and second requirements. Accordingly, the court erred in admitting that hearsay under OEC 803(2).

Carlson's first element, "whether an event is sufficiently startling to qualify, cannot be determined without focusing on the event's effect on the declarant." *Carlson*, 311 Or at 216. That inquiry is *subjective*—whether the event did, in fact, startle the particular declarant. The objective character of the alleged precipitating event—*i.e.,* was this the sort of event that would, reasonably, have caused a person in the declarant's situation to be startled?—may, in some circumstances, support an inference of subjective excitement. But it is not conclusive.

We determine that defendant's second call to the victim was not a subjectively startling event for two related reasons. First, the only evidence of the victim's contemporaneous reaction was her mother's description of her daughter's demeanor during their conversation, which occurred within minutes, and perhaps moments, of the supposed startling event. According to her mother, the victim's manner was "stern" when she spoke with her mother about defendant's most recent telephone call. Moreover, the victim deliberately and carefully repeated the information for a second time so that her mother's boyfriend could hear it. There is no evidence that the victim exhibited any of the usual indicia of excitement. Nor is there any evidence that the victim's "stern" demeanor in this instance was somehow, characteristically, just the opposite; that is, there is no evidence that the victim's characteristic "excited" response to an allegedly stressful event was to become "stern."

Second—and consistent with the victim's ostensibly deliberate reaction—the subject matter of defendant's second call was not objectively startling. Unlike defendant's first

call, which informed the victim that the children were not being returned as planned and which, at least, implied that the children were in a broken-down car at an undisclosed location, the second call related that the children would be returned shortly, albeit at a different place than originally planned. Thus, the objective content of the second call, coupled with the only evidence of the victim's contemporaneous subjective response, cannot support a reasonable inference that defendant's second call was, in fact, a startling event for purposes of OEC 803(2).

A similar analysis applies to *Carlson*'s second element, *viz.*, that the statement must have been made while the declarant was still under the stress of excitement caused by the startling event. 311 Or at 218. The victim's deliberate demeanor during her second conversation with her mother was the antithesis of startled spontaneity.

In so holding, we find this case to be materially distinguishable from *Stonaker*. In *Stonaker*, we rejected the trial court's conclusion that a declarant's statements could not qualify as excited utterances because the declarant was "calm" when she made some of the statements. 149 Or App at 741. In that case, the hearsay in question was a 9-1-1 telephone call that lasted approximately four minutes. The declarant was sobbing and incoherent at the beginning of the call, but "became calmer only after the 9-1-1 operator told her to 'stop crying' and thereafter twice told her, 'Listen to me!' " *Id.* Here, by comparison, the only information we have about the declarant victim's demeanor during her second telephone call to her mother was that she was stern. While sternness is not necessarily inconsistent with the stress of excitement, it also is not necessarily indicative of the stress of excitement.

The state also relies on *State v. Moen*, 309 Or 45, 786 P2d 111 (1990), for the proposition that the victim's second telephone call qualified as an "excited utterance." In *Moen*, the court held that certain statements made by a declarant to a physician were admissible under OEC 803(4), concerning statements made for purposes of medical diagnosis or treatment. 309 Or at 55-59. In *dictum*, the court went on to note that, although the statements had not been offered as excited utterances, they would have been admissible as such. *Id.* at

59. The statements in question were made to the declarant's physician and concerned the declarant's fear of the defendant:

> "At the time of the interview, which lasted 30 to 40 minutes, [the declarant] was so upset that she cried through most of the interview and, according to the physician, at the same time she was 'anxious and nervous to the point, I think, you could describe her as being fairly agitated. It was impossible to conduct an interview with her. * * * She couldn't concentrate or answer my questions directly. She was obviously extremely nervous.' " *Id.* at 60 (ellipsis in original).

The state suggests that we can infer from the record here that the victim, like the victim in *Moen*, was "anxious and nervous." However, we find the differences more significant than the similarities. In *Moen*, the declarant was crying, anxious, extremely nervous, and agitated. Here, by comparison, the victim was stern. In *Moen*, the declarant was so upset that the physician could not successfully conduct an interview with her. Here, by comparison, the victim carefully imparted her information not only to her mother, but to a second listener as well.

We thus conclude that the trial court erroneously determined that the victim's statements in her final telephone conversation with her mother were admissible under the "excited utterance" exception. OEC 803(2).[10]

■ We must next address whether that error was reversible error. Evidentiary error is not presumed to be prejudicial. OEC 103(1). Evidentiary error is harmless if there is little likelihood that it affected the verdict. *State v. Phillips*, 314 Or 460, 471, 840 P2d 666 (1992). The ultimate question here, then, is whether there is "little likelihood" that the erroneous admission of the victim's final telephone conversation with her mother affected the verdict.[11]

---

[10] Those hearsay statements were admitted at defendant's bail hearing under OEC 803(3), the "state of mind" exception to the hearsay rule. However, at the pretrial hearing on defendant's motion *in limine*, the state explicitly abandoned that theory of admissibility. The state does not argue on appeal that OEC 803(3) provides an alternative basis for admissibility of those statements.

[11] On appeal, defendant does not make any constitutional arguments in relation to this assignment of error. In the trial court, he asserted that admission of this hearsay would violate his constitutional rights under the confrontation clauses

■     In exercising our harmless error review function in this case, we consider, successively, two questions. First, what was the relative strength of the parties' evidence? And second, in the totality of the parties' evidence, how significant was the erroneously admitted evidence?

■     We begin by assessing the relative strength of the parties' cases. The state presented a strong case, undergirded with compelling evidence of motive and contradictory and ostensibly inculpatory statements by defendant, particularly with respect to his actions and whereabouts on the night of the murder. Moreover, as discussed below, the victim's hearsay statements were critical in placing defendant near the time and place of the murder. However, the state's case was almost entirely circumstantial. Although defendant admitted that he was out of his apartment for at least part of the critical time period, no eyewitness placed defendant or the car he was driving near the murder scene. Defendant's fingerprints were not found at the murder scene. The murder weapon was never recovered. The murderer's bloody gloves — if gloves were used — and bloody clothes were never found. The only physical evidence purportedly linking defendant to the crime was the "contaminant" on a single hair shaft bearing DNA that was consistent with some 10 percent of the population, including defendant.

Defendant represented himself, with the assistance of court-appointed advisors, and his case can be characterized, most constructively, as pointing out the imponderables or weaknesses in the state's circumstantial case: How could defendant, within a "window" of no more than an hour and a half, have left his apartment, lured the victim to a street nearly three tenths of a mile from their alleged meeting place, bludgeoned the victim to death with nearly two dozen blows, caused the van to enter the highway, and effectively disposed of the murder weapon and any bloody gloves and

---

of both the state and the federal constitutions. If admission of the evidence were in violation of the federal constitution, we would be required to determine whether the error was harmless "beyond a reasonable doubt." *State v. Lotches*, 331 Or 455, 488, 17 P3d 1045 (2000), *cert den* 122 S Ct 82 (2001). However, given our ultimate conclusion below that defendant prevails under the nonconstitutional harmless error standard, we need not decide whether defendant has adequately raised the constitutional question on appeal.

clothing—all without being seen by anyone and all, presumably, while in the company of his four-year-old son?

We turn to the final harmless error consideration, the contextual and global significance of the erroneously admitted evidence. The victim's mother's recounting of her daughter's statements at about 8:00 p.m.—that she had just spoken with defendant and was going to meet him at the closed Mobil station—was the only direct evidence that the victim met defendant within minutes of her murder near where she was murdered. That evidence—which was buttressed by telephone records showing that the victim had, in fact, called her mother at 7:59 p.m.—directly contradicted defendant's account. As the state acknowledges, the evidence of the victim's second telephone call to her mother was among the most compelling evidence against defendant. The state observes that that second telephone call "revealed the lie [defendant] used to induce [the victim] to leave her house and meet him." If the jury believed that evidence, they would convict.

We do not suggest that there was no other admissible evidence from which the jury could reasonably infer that defendant met the victim at the Mobil station after 8:00 p.m. on the night of her death. The handwritten notation could reasonably bear such an inference. But the notation does not refer to defendant or to picking up the children. The recounting of the 7:59 telephone call supplies the missing link. It makes what might otherwise be reasonably inferred direct and explicit. In the totality of the circumstances, we cannot deem the erroneous admission of that evidence to be harmless.

Reversed and remanded.